# NASH *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 197. Argued March 18, 19, 1913.—Decided June 9, 1913.

In many instances a man's fate depends upon his rightly estimating, that is as the jury subsequently estimates it, some matter of degree, and there is no constitutional difficulty in the way of enforcing the criminal provisions of the Sherman Anti Trust Act on the ground of uncertainty as to the prohibitions.

The Sherman Act punishes the conspiracies at which it is aimed on the common law footing and does not make the doing of any act other than the act of conspiring a condition of liability. In this respect it differs from § 5440 and the indictment need not aver overt acts in furtherance of the conspiracy. *Brown* v. *Elliott*, 225 U. S. 392, distinguished.

This court can see no reason for reading into the Sherman Act more than it finds there.

It is not necessary for an indictment under the Sherman Act to allege

or prove that all the conspirators proceeded against are traders. *Loewe v. Lawlor,* 208 U. S. 274.

Where the indictment under the Sherman Act alleges numerous methods employed by the defendants to accomplish the purpose to restrain trade, it is not necessary, in order to convict, to prove every means alleged but it is error to charge that a verdict may be permitted on any one of them when some of them would not warrant a finding of conspiracy.

186 Fed. Rep. 489, reversed.

THE facts, which involve the validity of a verdict and sentence for alleged violations of the Sherman Anti-Trust Act, are stated in the opinion.

*Mr. Samuel B. Adams* and *Mr. John C. Spooner,* with whom *Mr. George Rublee* was on the brief, for petitioners.

*Mr. Assistant to The Attorney General Fowler,* with whom *Mr. Alexander Akerman,* United States Attorney, was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an indictment in two counts—the first for a conspiracy in restraint of trade, the second for a conspiracy to monopolize trade, contrary to the act of July 2, 1890, c. 647, 26 Stat. 209, commonly known as the Sherman Act. Originally there was a third count for monopolizing, but it was held bad on demurrer and was struck out.

The allegations of fact in the two counts are alike. Summed up in narrative form they are as follows: The American Naval Stores Company, a West Virginia corporation having its principal office in Savannah and branch offices in New York, Philadelphia, Chicago, etc., was engaged in buying, selling, shipping and exporting spirits of turpentine in and from Southern States to other States and abroad. Nash was the president; Shotter, chairman

of the board of directors; Myers, vice-president; Boardman, treasurer; DeLoach, secretary, and Moller, manager of the Jacksonville, Florida, branch. The National Transportation and Terminal Company, a New Jersey corporation, had warehouses and terminals for handling spirits of turpentine and naval stores at Fernandina, and other places named, in Florida, Alabama, Mississippi, etc., and was engaged in storing such turpentine and rosin and issuing warehouse receipts for the same. Myers was the president; DeLoach the secretary and Moller manager of the Jacksonville branch. On May 1, 1907, it is alleged, these corporations and individuals conspired to restrain commerce in the articles named, among the States and with foreign nations—the restraint to be effected in the following ways among others: (1) by bidding down turpentine and rosin so that competitors could sell them only at ruinous prices; (2) by causing naval stores receipts that naturally would go to one port to go to another; (3) by purchasing thereafter a large part of 'its' supplies at ports known as closed ports and, with intent to depress the market, refraining from purchasing any appreciable part at Savannah, the primary market in the United States for naval stores, where purchases would tend to strengthen prices, the defendants taking the receipts at the closed ports named on a basis of the market at Savannah; (4) by coercing factors and brokers into contracts with the defendants for the storage and purchase of their receipts and refusing to purchase from such factors and brokers unless such contracts were entered into; (5) by circulating false statements as to naval stores production and stocks on hand; (6) by issuing fraudulent warehouse receipts; (7) by fraudulently grading, regrading and raising grades of rosins and falsely gauging spirits of turpentine; (8) by attempting to bribe employés of competitors so as to obtain information concerning their business and stocks; (9) by inducing consumers, by payments and

threats of boycotts, to postpone dates of delivery of con-
tract supplies and thus enabling defendants to postpone
purchasing when to purchase would tend to strengthen the
market; (10) by making tentative offers of large amounts
of naval stores to depress the market, accepting contracts
only for small amounts and purchasing when the market
had been depressed by the offers; (11) by selling far below
cost in order to compel competitors to meet prices ruinous
to everybody; (12) by fixing the price of turpentine below
the cost of production—all the foregoing being for the pur-
pose of driving competitors out of business and restraining
foreign trade or, in the second count, of doing the same and
monopolizing the trade.

The two counts before us were demurred to on the
grounds that the statute was so vague as to be inoperative
on its criminal side; that neither of the counts alleged any
overt act; that the contemplated acts and things would
not have constituted an offence if they had been done, and
that the same acts, etc., were too vaguely charged. The
demurrer was overruled and this action of the court raises
the important questions of the case. We will deal with
them before passing to matters of detail.

The objection to the criminal operation of the statute is
thought to be warranted by *The Standard Oil Co.* v.
*United States*, 221 U. S. 1, and *United States* v. *American
Tobacco Co.*, 221 U. S. 106. Those cases may be taken to
have established that only such contracts and combina-
tions are within the act as, by reason of intent or the in-
herent nature of the contemplated acts, prejudice the
public interests by unduly restricting competition or un-
duly obstructing the course of trade. 221 U. S. 179. And
thereupon it is said that the crime thus defined by the
statute contains in its definition an element of degree as
to which estimates may differ, with the result that a man
might find himself in prison because his honest judgment
did not anticipate that of a jury of less competent men.

The kindred proposition that 'the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty,' is cited from the late Mr. Justice Brewer sitting in the Circuit Court. *Tozer* v. *United States*, 52 Fed. Rep. 917, 919.

But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. "An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it" by common experience in the circumstances known to the actor. "The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw." *Commonwealth* v. *Pierce*, 138 Massachusetts, 165, 178. *Commonwealth* v. *Chance*, 174 Massachusetts, 245, 252. "The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct." 1 East P. C. 262. If a man should kill another by driving an automobile furiously into a crowd he might be convicted of murder however little he expected the result. See *Reg.* v. *Desmond*, and other illustrations in Stephen, Dig. Crim. Law, art 223, 1st ed., p. 146. If he did no more than drive negligently through a street he might get off with manslaughter or less. *Reg.* v. *Swindall*, 2 C. & K. 230; *Rex* v. *Burton*, 1 Strange, 481. And in the last case he might be held although he himself thought that he was acting as a prudent man should. See *The Germanic*, 196 U. S. 589, 596. But without further argument, the case is very nearly disposed of by *Waters-Pierce Oil Co.* v.

*Texas* (No. 1), 212 U. S. 86, 109, where Mr. Justice Brewer's decision and other similar ones were cited in vain. We are of opinion that there is no constitutional difficulty in the way of enforcing the criminal part of the act.

Coming next to the objection that no overt act is laid, the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common law footing— that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability. The decisions as to the relations of a subsequent overt act to crimes under Rev. Stat., § 5440, in *Hyde* v. *United States*, 225 U. S. 347, and *Brown* v. *Elliott*, 225 U. S. 392, have no bearing upon a statute that does not contain the requirement found in that section. As we can see no reason for reading into the Sherman Act more than we find there, we think it unnecessary to offer arguments against doing so.

As to the suggestion that the matters alleged to have been contemplated would not have constituted an offence if they had been done, it is enough to say that some of them conceivably might have been adequate to accomplish the result, and that the intent alleged would convert what on their face might be no more than ordinary acts of competition or the small dishonesties of trade into a conspiracy of wider scope, as has been explained more than once. *Swift & Co.* v. *United States*, 196 U. S. 375, 396; *Loewe* v. *Lawlor*, 208 U. S. 274, 299. Of course this fact calls for conscience and circumspection in prosecuting officers, lest by the unfounded charge of a wider purpose than the acts necessarily import they convert what at most would be small local offences into crimes under the statutes of the United States. But we cannot say, as was the case in *United States* v. *Winslow*, 227 U. S. 202, 218, that no intent could convert the proposed conduct into such a crime.

Finally, we cannot pronounce the counts before us bad for uncertainty. On demand of the defendants a bill of

particulars-was furnished, and there is no reason to fear that injustice was done in that respect.—There was no need to allege or prove that the conspirators themselves were all traders. *Loewe* v. *Lawlor*, 208 U. S. 274, 301.— The first count, at least, was well enough.

After the demurrer was overruled the defendants pleaded not guilty and there was,a trial and a verdict finding that Nash, Shotter, Myers, Moller and Boardman were guilty and DeLoach not guilty, but saying nothing as to the corporations. Numerous exceptions were taken, but as writs of certiorari are not granted to bring up the ordinary incidents of a criminal trial we shall say little more than is necessary to dispose of the case. It was argued with a good deal of force that the only evidence of the alleged conspiracy was certain acts done on behalf of the corporations; that the only ground for charging the defendants who were found guilty was their relation to the companies and their being presumably cognizant of and more or less responsible for the corporate acts; that if those acts tended to prove a conspiracy they proved that the corporations more clearly than any one else were parties to it, and therefore that a verdict that was silent as to them ought to be set aside. We need not consider the effect of Rev. Stat., § 1036, or whether on the evidence it was possible to find the defendants guilty by reason of an intent not shown to be shared by the corporations, as the judgment must be reversed for another reason.

The reason is this. The court in its instructions told the jury to "consider the evidence of the means which it is insisted by the prosecution tends to show a conspiracy" and said: "You will consider carefully all the means which the indictment charges" and "It is sufficient if it be shown beyond a reasonable doubt that some of these means charged were a part of the common scheme, design or understanding or conspiracy by two or more of the defendants, and that these same means were of themselves

sufficient to cause an essential obstruction and restraint of the free and untrammelled flow of trade and commerce between the States and foreign nations." Thus while it may be admitted that not, all the means alleged need be proved, the charge invited the jury to consider all and permitted a verdict upon any one of them. The fifth, sixth and eighth statements of means to be employed were withdrawn from the jury, but the jury's attention seems not to have been called to the fact that some of the charges were abandoned, in the connection in which it was important. Furthermore one of the means alleged was the false raising of grades and false gauging. Taken with other evidence, if it was shown to be systematic it would have had a tendency to show the scheme alleged. But taken by itself, as the jury might have taken it under the instructions, it showed only cheating and could not warrant a finding of the conspiracy with which the defendants were charged. It is unnecessary to consider whether there was any evidence sufficient to warrant a conviction upon some of the other means alleged, for instance the first, as the absence of such evidence only would add another reason for holding the instructions wrong upon a vital point.

*Judgment reversed.*

MR. JUSTICE PITNEY dissents.