OREAR et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. November 25, 1919.)

No. 3354.

1. CONSPIRACY ⊜⟶38—EFFECT OF ABANDONMENT OF SEDITIOUS CONSPIRACY.

Where a conspiracy has been fully formed to oppose by force the authority of the United States, its subsequent abandonment does not relieve the conspirators from criminal liability, under Criminal Code, § 6 (Comp. St. § 10170).

2. CRIMINAL LAW ⊜⟶780(3)—INSTRUCTIONS AS TO TESTIMONY OF ACCOMPLICES.

Instructions on a trial for criminal conspiracy *held* to sufficiently caution the jury with respect to the testimony of defendants, who pleaded guilty and were witnesses for the government.

In Error to the District Court of the United States for the Eastern District of Texas; Duval West, Judge.

Criminal prosecution by the United States against Will Orear and others. Judgment of conviction, and defendants bring error. Affirmed.

C. Nugent, of Eastland, Tex., T. N. Jones, of Tyler, Tex., and W. W. Berzett, of Emory, Tex., for plaintiffs in error.

R. C. Merritt, U. S. Atty., of McKinney, Tex., and J. B. Dailey, Asst. U. S. Atty., of Beaumont, Tex.

Before WALKER, Circuit Judge, and FOSTER and GRUBB, District Judges.

GRUBB, District Judge. The plaintiffs in error were tried and convicted in the District Court for the Eastern District of Texas for conspiracy. The indictment contained three counts. The plaintiffs in error were convicted only on the counts numbered 1 and 2. These counts charged an offense under section 6 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1089 [Comp. St. § 10170]), while the third count charged an offense under section 37 of the Penal Code (section 10201). Under counts 1 and 2, proof of an overt act was not required to convict. These counts charged the plaintiffs in error, together with others, some of whom pleaded guilty, and three of whom were acquitted, with conspiracy to resist the enforcement of a law of the United States, viz. the Selective Service Act, approved May 18, 1917 (40 Stat. 76, c. 15 [Comp. St. 1918, §§ 2019a, 2019b, 2044a–2044k]), by resisting by force the calling of registrants, in Rains County, Tex., and by resisting state or government officers who might attempt to arrest such persons for failing to comply with the law, and by procuring arms and ammunition necessary to prevent by force the drafting of persons of said county, who had registered, into the military service of the United States.

There are 22 errors assigned. The questions presented by them are three: First, whether there was evidence in the record sufficient to show a conspiracy on the part of the 17 plaintiffs in error of the

kind charged in the first counts of the indictment; second, whether the plaintiffs in error abandoned any conspiracy they may have formed, before guilt attached to them; third, whether the District Judge charged correctly upon the law of accomplice evidence.

The evidence is voluminous. It related to what happened at two meetings—one at New Home schoolhouse on a Sunday night, and the other at Sandy Eddy on the following Monday afternoon—and to the subsequent purchase of weapons by some of the plaintiffs in error. The holding of the meetings was not in dispute, nor the presence of the plaintiffs in error at one or both of them. The purpose of the meetings, the extent of participation of the various plaintiffs in the error in them, and the abandonment of the project at the second meeting, as claimed by plaintiffs in error, and the purpose for which some of the plaintiffs in error procured guns after the two meetings, were the disputed questions of fact. The government offered substantial evidence tending to show that the plaintiffs in error were at the New Home schoolhouse meeting, and that at that meeting inflammatory speeches were made, directed against the drafting of young men who had registered and the sending of them to France to fight Germany, and that two votes were taken at that meeting—one in which the younger men within the draft age participated, to the effect that they would prefer to die at home to dying in France, and the other, in which the older men, who were over the draft age, alone participated, to the effect that they would stand behind the younger men in the carrying out of their resolve.

In connection with the seditious remarks testified to have been made at the first meeting preceding the taking of the two votes and the evidence tending to show a guilty sense of having violated the law, and the suspicion of the presence of a spy, the jury might well have found from the government's evidence that a conspiracy to forcibly resist the Selective Service Act was there intended and formed. It is true that the witnesses for the defendants, if believed, gave an entirely different and an innocent complexion to the meeting. The defendants' evidence tended to show that the meeting was open and public, and not secret. Its purpose, according to the defendants' evidence, was merely to discuss a supposed overdraft in Rains county, and to take steps to secure a contribution to pay the expenses of a committee, which had gone to Austin the preceding day to attempt to secure an adjustment of the overdraft, and it was claimed by defendants that nothing seditious was spoken at the meeting; the discussion being confined to the question of the overdraft and the expense attending its adjustment. The determination of the correct version of the purpose of and of what happened at the New Home schoolhouse meeting was for the jury, and they determined it upon substantial evidence adversely to the contentions of the plaintiffs in error.

The New Home schoolhouse meeting adjourned to meet the next afternoon at the place of the plaintiff in error, Will Orear, at Sandy Eddy. The plaintiffs in error assert that the record fails to show that a completed conspiracy was formed at the first meeting, and contend that tentative discussion does not constitute a conspiracy in law.

We are of the opinion that the votes taken at the first meeting might have been interpreted by the jury as an agreement on the part of those present and voting to resist the draft law by those subject to draft, and to aid those subject to draft in forcibly resisting it by those who were beyond the draft age. The conspiracy may have been smaller in numbers than the attendance at either of the meetings, and yet the inner conspiracy would fasten guilt upon the conspirators, though others who attended the meetings were innocent. We think it was open to the jury to find that plaintiffs in error were parties to the conspiracy, because of what the government's evidence tended to show transpired at the New Home schoolhouse.

· The District Judge charged the jury that, in order to convict the defendants, they must believe from the evidence that the conspiracy was complete, and not merely tentative. It is true that at the subsequent meeting at Sandy Eddy little was added to the government's case. The meeting assembled at the place designated at the first meeting, and was addressed by a lawyer named Berzette, who advised them, according to the government's contention, that their assembly might be held to be a violation of the law, and on this advice the meeting dispersed, without doing anything further. The defendants' contention was that Berzett advised the meeting that the committee that went to Austin had returned with the report that Rains County had been treated fairly in the draft, and, upon receipt of this information, the people dispersed and went home satisfied.

[1] The government's evidence tended to show that the plaintiff in error John Trumble, after Berzett had spoken, called an informal meeting and with some of the plaintiffs in error renewed the design of resisting the draft by force, if it became necessary. If the government established a conspiracy in which the plaintiffs in error participated, by what took place at the New Home schoolhouse meeting, the crime was then completed and the guilt of the plaintiffs in error was then fixed beyond repentance, and a subsequent dissolution of the conspiracy and an abandonment of the project at the Sandy Eddy meeting, if it had occurred, would not have relieved plaintiffs in error from criminal responsibility.

Section 6 of the Penal Code does not base conspiracy on the doing of an overt act, as does section 37 of the Penal Code. It is, in this respect, like the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]). Under that act the Supreme Court held that common-law conspiracies were made punishable, and that it did not make "the doing of any act other than the act of conspiring a condition of liability." Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232. Withdrawal from the conspiracy after its formation would not exculpate from guilt, under the charge made in the only counts upon which the plaintiffs in error were found guilty. We are not to be understood as holding that the evidence as to what transpired at the Sandy Eddy meeting indicated an abandonment of the project upon the part of the plaintiffs in error, though it may as to some of those who attended.

The evidence of the government as to what happened after the Sandy

Eddy meeting had broken up, and in the group around the defendant John Trumble, is corroborated by the evidence, which shows the subsequent procuring of high-power guns by some of the plaintiffs in error. The sufficiency of the explanation of the purposes for which these guns were procured, given by the plaintiffs in error, who were concerned in procuring them, was for the jury. The coincidence of so many of them having procured rifles immediately after the meeting and having made two trips to Dallas, 80 miles distant, in the automobile of the plaintiff in error Pffer Orear, and the subsequent hiding of the guns by the plaintiff in error Will Orear, in connection with the explanations given by him and by his father of the purpose for which he hid them, left plenty of room for the jury to have inferred that they were procured for the purpose charged by the government, and testified to by those of the defendants who entered pleas of guilty and who testified for the government.

We think there was sufficient evidence introduced on the trial to justify the jury in finding that an illegal conspiracy to forcibly resist the draft had been consummated; that it had not been abandoned, at least by the plaintiffs in error (if that were necessary to be shown), but had been carried out by some of the plaintiffs in error to the extent of getting guns to that end.

[2] The court charged the jury that—

"In weighing the evidence of those defendants who are testifying for the government, you should have due regard to the fact that they have each pleaded guilty to the indictment, as well as to the fact of their being defendants, though not on trial. You are directed to weigh carefully their testimony, and cautioned against placing too firm a reliance upon it, unless the same should be corroborated by testimony of witnesses other than principals, or by other facts and circumstances that verify their testimony in material particulars."

In the federal courts, the testimony of accomplices may be sufficient to convict, in the absence of corroboration. Diggs and Caminetti v. United States, 242 U. S. 471, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168. In this case there was in fact corroboration of facts proven by witnesses other than participants in the conspiracy. The charge of the District Judge was all that the plaintiffs in error were entitled to upon the subject of accomplice testimony. It pointed out with sufficient clearness what witnesses were to be treated as accomplices—those who testified for the government and who had either entered pleas of guilty to the indictment, or who were shown to have been principals in the conspiracy by the evidence.

We find no error in the record, and the judgment is affirmed.