Wesley Eugene DAHL, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–85–080–CR.

Court of Appeals of Texas, Austin.

March 26, 1986.

Kenneth E. Houp, Jr., Austin, for appellant.

Ronald Earle, Dist. Atty., Paul Womack, Asst. Dist. Atty., Austin, for appellee.

Before POWERS, EARL W. SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

Appellant pleaded guilty to the felony offense of driving while intoxicated and was sentenced by the court to four years in the Department of Corrections (probated) and a fine of $750.00. 1983 Tex.Gen. Laws, ch. 303, § 3, at 1574 (Tex.Rev.Civ. Stat.Ann. art. 6701*l*–1.[1] Appellant stipulated to an Intoxilyzer reading of .21 and does not challenge the sufficiency of the evidence. Appellant brings three gounds of error: (1) the definition of "intoxication" in art. 6701*l*–1(a)(2)(B) [1983] is impermissibly vague in violation of the Fifth and Fourteenth amendments to the United States Constitution and art. I, § 19 of the Texas Constitutions; (2) art. 6701*l*–1 [1983] violated due process under the United States and Texas Constitution because it is void for vagueness; and (3) the indictment should have alleged the manner and means by which appellant "operated" a motor vehicle.

Appellant's first two grounds of error challenge the constitutionality of art. 6701*l* –1 [1983]. The statute reads:

(a) In this article:

(1) "Alcohol concentration" means:

(A) the number of grams of alcohol per 100 milliliters of blood;

(B) the number of grams of alcohol per 210 liters of breath; or

(C) the number of grams of alcohol per 67 milliliters of urine.

(2) "Intoxicated" means:

\* \* \* \* \* \*

(B) having an alcohol concentration of 0.10 percent or more.

In his first ground of error, appellant contends that when art. 6701*l*–1(a)(2)(B) [1983] and (a)(1)(A–C) are read together, as they must be, the combination of the word "per-

cent" in the definition of "intoxicated" and the weight per volume measurement in the definition of "alcohol concentration" results in a statute that yields: (1) gibberish or (2) different standards of intoxication depending on whether a person's blood, breath or urine is tested. In his second ground of error, appellant contends that the definition of the offense in art. 6701*l*–1 [1983] does not give a person of ordinary intelligence notice of what conduct is prohibited and does not provide guidelines to discourage arbitrary and discriminatory enforcement. We disagree with appellant's contentions.

The subject of the alcohol-impaired driver has generated a large quantity of literature. Some basic principles relating to alcohol's effect on drivers, particularly measurement of the level of intoxication, will clarify appellant's contentions and our resolution of them.

## METABOLISM OF ALCOHOL [2]

Once alcohol has been ingested, it is absorbed slowly through the stomach wall into the capillary circulation. Later, as the contents of the stomach reach the upper end of the small intestine, the alcohol is absorbed more rapidly, with the rate of absorption depending on a number of variables. Following the first absorption of some alcohol into the blood stream, alcohol is carried to all portions of the body and, by diffusion, distributed throughout its water-containing tissue. After absorption has been completed, the concentration of alcohol in the various tissues will vary according to their water content. The greater the water content of the tissue, the greater its alcohol content will be in relation to other tissues. Thus, following absorption, if one can *measure* the alcohol content of one

---

1. This cause arises under art. 6701*l*–1 as amended by the 68th Legislature effective January 1, 1984. The 69th Legislature again amended art. 6701*l*–1, effective March 28, 1985. 1985 Tex. Sess.Law Serv., ch. 10, § 1, at 19. The latter amendment removed from the statute the wording on which appellant bases his constitutional claims. See n. 4, *infra*. For the sake of clarity, we will refer to art. 6701*l*–1, as it read from

January 1, 1984, to March 28, 1985, as art. 6701*l* –1 [1983].

2. The discussion of the metabolism of alcohol has been drawn from: R. Donigan, Chemical Tests and the Law, at 1–20, 282–287, 291–293 (2d ed. 1966); Note, Chemical Test Presumptions, 20 San Diego L.Rev. 301 (1983).

body tissue or fluid, one can *calculate* the alcohol content of any other fluid or tissue. Eventually all of the ingested alcohol will be removed by the body's metabolic processes.

### TESTING

There is widespread agreement that the driving ability of all individuals is impaired at a blood alcohol concentration of .10% or higher. R. Donigan, Chemical Tests and the Law, at 12 (2d ed. 1966); Note, Chemical Test Presumptions, 20 San Diego L.Rev. 301, 322 fn. 89 and works cited therein (1983). The alcohol concentration in the blood is generally accepted as the best biochemical index of alcoholic influence. Impairment of one's capabilities, both physical and mental, is a function of the alcohol concentration in the blood passing to the nerve centers. Donigan, *supra.* Standards first were developed in terms of the amount of alcohol in the blood. Later, because of the ease of obtaining breath samples, breath testing became a common law enforcement technique. 1 Erwin, Defense of Drunk Driving Cases § 14.01 (3rd ed. 1986) [hereafter Erwin]. Breath testing, if properly conducted, is widely accepted as reliable. 1 Erwin, § 18.00, at 18–2. Breath testing methodology is based on the premise that at any given temperature, the ratio between the concentration of alcohol in the blood and that in the air from the lungs is constant. Verification of this fact and the numerical magnitude of this ratio was done experimentally. 1 Erwin, § 18.-01, at 18–4 to 18–7. As blood containing alcohol passes through the lungs, a fractional amount tends to diffuse through the pulmonary membranes and enter the lungs, where it is exhaled. A fluid dissolved in a liquid will, over time, partially diffuse into an adjacent gas in a distribution predictable for that fluid. A general law of physics, Henry's law, describes the rate of diffusion. This predictable relationship is what allows a measurement of a person's *breath*

to be extrapolated to show the concentration of alcohol in the *blood.*

The ratio used as the standard for converting breath measurements to blood alcohol levels is 2100 to 1; that is, the amount of alcohol in 2100 milliliters of alveolar (deep-lung) air will equal the amount of alcohol in 1 milliliter of blood. The amount of alcohol in breath is multiplied by 2100 to extrapolate the amount in the blood. As noted in many sources, the 2100 to 1 ratio is not the ratio that yields the true best estimate of blood alcohol concentration derived from a breath test. That ratio is closer to 2280 to 1. The 2100 to 1 ratio underestimates the blood alcohol concentration for most of the population. The chosen average of 2100 to 1 represents a "benefit of the doubt" compromise for law enforcement purposes. 1 Erwin, § 18.01[a], at 18–11 to 18–13; Chemical Test Presumptions, at 327–328. The 2100 to 1 ratio is not perfect. *Id.* It is not representative of the ratio for the entire population in the sense that any given individual might have a different blood-breath ratio. But neither can it be said to be an arbitrary or capricious choice as a measuring standard. *Slagle v. State,* 570 S.W.2d 916 (Tex.Cr.App. 1978) (underlying scientific basis for the ratio is rational). It is the figure incorporated in the National Highway Traffic Safety Administration "Standard for Devices to Measure Breath Alcohol." 38 Fed. Reg. 30,459 (1973); 49 Fed.Reg. 48,854 (1984) (mandatory regulations for states receiving federal money and using this money to purchase breath testing devices; after December 1984, guidelines).

### BREATH ALCOHOL TESTING DEVICES

Breath alcohol testing devices were designed to collect a quantity of breath, measure the amount of alcohol in that sample, and report the amount of alcohol in the blood, using the 2100 to 1 conversion factor. *See, e.g.,* 37 Tex.Admin.Code § 19.-1(b)(4) [Shepard's 1982][3] ("The instrumen-

---

**3.** The Texas Department of Public Safety Breath Alcohol Testing Regulations are codified at 37

Tex.Admin.Code § 19.1–19.6 (1985). The regulations were amended effective April 4, 1984. 9

tal analysis of breath ... for use in converting to blood alcohol concentration.") The use of these devices has generated substantial controversy as to their accuracy and reliability. *See generally* 1 Erwin, § 18.00 and following. One such device is the Intoxilyzer Model 4011AS–A, the model used in this case, which uses infrared analysis. The device measures the breath and reports a number that represents the number of grams of alcohol per 100 milliliters of blood or 210 liters of breath. The Intoxilyzer measures breath but its report is in terms of a blood-breath equivalent, using the 2100 to 1 ratio. 2 Erwin, § 24A.02, at 24A–4.6 (quoting from the operator's manual); Standards for Devices to Measure Breath Alcohol, 49 Fed.Reg. 48,- 854 (1984).

A few Texas cases have dealt specifically with interpreting Intoxilyzer readings. In *Murray v. State,* 689 S.W.2d 247 (Tex.App. 1985, pet. ref'd), the court, in ruling on a sufficiency of the evidence point, summarized the evidence concerning the Intoxilyzer test. One officer testified that the Intoxilyzer examinations showed the defendant's blood-alcohol content to be 0.17. *Id.* at 251. A DPS chemist then testified that the .17 *reading* was accurate. *Id.* (emphasis added). In other words, a .17 reading based on a *breath* measurement, translated into a .17 *blood* alcohol content. In *Long v. State,* 649 S.W.2d 363 (Tex.App.1983, pet. ref'd), the court described the result of an Intoxilyzer exam as follows: "The test showed a .20 *reading*—meaning a .20 percent alcohol concentration in his *bloodstream."* *Id.* (emphasis added).

That the Intoxilyzer reading may now be reported directly in terms of breath, *i.e.,* the number of grams of alcohol per 210 liters of breath, does not change the underlying operating premise of the machine. It incorporates the 2100 to 1 blood-breath equivalence.

## STATUTORY CONSTRUCTION

Several principles of statutory construction apply to both the first and second grounds of error. It is the duty of the Court to construe a statute so that the legislative intent of enacting constitutional laws will be carried out. *Ex parte Groves,* 571 S.W.2d 888 (Tex.Cr.App.1978). To assign a meaning to a statute, the court takes a general view of the enactment as a whole in order to ascertain the legislative intent. *State v. Terrell,* 588 S.W.2d 784 (Tex.1979). A statute is to be given a rational and sensible construction. The court does not ascribe an intent to do an unreasonable thing if the statute can be construed to prevent it. *Wade v. State,* 572 S.W.2d 533 (Tex.Cr.App.1978). A court is to enforce the intent of the statute even if the intent is not completely consistent with the language of the statute. *State v. Terrell, supra.* The Legislature is presumed to enact legislation with full knowledge of the law already in existence. *First National Bank of Kerrville v. Hackworth,* 673 S.W.2d 218 (Tex.App.1984, no writ).

## INCORPORATION OF THE EQUIVALENCE IN THE STATUTE

The Legislature understood the blood-breath equivalence ratio. *Slagle v. State,* 570 S.W.2d 916 (Tex.Cr.App.1978) (the underlying scientific basis for the ratio is rational). Regulations promulgated by the Department of Public Safety under Tex. Rev.Civ.Stat.Ann. art. 6701*l*–5, which were in effect until April 4, 1984 (that is, they were in effect at the time the Legislature worked on the bill) specified that the "instrumental analysis of breath shall sufficiently accurately reflect the breath alcohol concentration for use in converting to blood alcohol concentration." 37 Tex.Admin. Code § 19.1(b)(4) [Shepard's 1982]. Also, "The results of an analysis of breath for

Tex.Reg. 1701 (1984). The regulations existed before January 1, 1976, as Rules 201.10.00.- 001–.006. 2 Tex.Reg. 61 (1977). Since the text of the regulations as it existed prior to amendment did not appear in the Texas Register, for

convenience the text as it existed prior to April 4, 1984, will be cited to the now-superseded version of the Texas Administrative Code published by Shepard's as: 37 Tex.Admin.Code § 19.1–19.6 [Shepard's 1982].

alcohol shall be expressed in terms of % w/v, that is, grams of alcohol per 100 milliliters of blood...." *Id.* at § 19.2(c)(5). In setting out the requirements for chemical breath test instrument certification, the regulations state that the criteria set out in the regulations conform to the guidelines set by the National Highway Traffic Safety Administration. These guidelines (49 Fed. Reg., *supra*) define blood alcohol concentration as "percent weight by volume (% w/v) based upon grams per 100 cubic centimeters [milliliters] of blood or 210 liters of breath ..." The regulations go on to state: "A blood alcohol concentration of .10% w/v means .10 grams per 100 cubic centimeters [milliliters] of blood or .10 grams of alcohol per 210 liters of breath." *Id.* at 48,857. This language is almost the same as that used in 6701*l*–1 which defines "intoxicated" as having an alcohol concentration of .10 percent and then says that alcohol concentration is grams per 100 milliliters of blood or grams per 210 liters of breath; *i.e.,* using *both* the percent and the number of grams in the same definition. The regulations note that the conversion factor is a "commonly used value recognized by the Committee on Alcohol & Other Drugs of the National Safety Council; that is, 210 liters of air at 34° C. contains approximately the same quantity as 100 cubic centimeters of pulmonary blood." *Id.* at 48,857 fn. 2.

## INTERPRETATION OF THE STATUTE

Appellant contends, in his first ground of error, that the definition of "intoxication" in art. 6701*l*–1(a)(2)(B) [1983] is impermissibly vague and so is void. A statute may be challenged for vagueness either on its face or as applied in a particular case. Appellant Dahl's Intoxilyzer reading was a .21. Under any interpretation of the statute advanced by appellant, he was intoxicated, as the highest reading that appellant contends would be necessary to demonstrate intoxi-

cation based on a breath test is .21. Therefore, the statute cannot be void as applied to appellant and must be void on its face to be invalid.

Appellant contends that when art. 6701*l*–1(a)(2)(B) [1983] and (a)(1)(A–C) [1983] are read together, as they must be, the result is gibberish. The statute reads as follows:

(a) In this article:

(1) "Alcohol concentration" means:

(A) the number of grams of alcohol per 100 milliliters of blood;

(B) the number of grams of alcohol per 210 liters of breath; or

(C) the number of grams of alcohol per 67 milliliters of urine.

(2) "Intoxicated" means:

\* \* \* \* \* \*

(B) having an alcohol concentration of 0.10 percent[4] or more.

Appellant first sets out what he says is the way to read the statute: a driver is intoxicated if he has .10 percent or more grams of alcohol per specified volume of blood, breath, or urine and says that "this form of words has no meaning in ordinary English." First, it is not clear that this is even the proper literal reading of the statute. It would be possible to take the definition of "intoxicated" as having an "alcohol concentration" of .10% or more and substitute a definition of alcohol concentration in place of the words "alcohol concentration." One such definition in the statute is "the number of grams of alcohol per 100 milliliters of blood." This literal substitution would result in the following sentence: Intoxicated means having number of grams of alcohol per 100 milliliters of blood of .10% or more. This sentence is far more grammatically garbled than appellant's proposed reading but is still capable of interpretation.

Part of appellant's assertion that his proposed reading of the statute results in gib-

---

**4.** The 1985 legislation cited in n. 1, *supra,* removed the word "percent" from art. 6701*l*

–1(a)(2)(B). *See* Tex.Rev.Civ.Stat.Ann. art. 6701 *l*–1 (Supp.1986).

berish perhaps stems from confusion about the word "percent." "Percent" simply means parts or a number of parts to every hundred. Webster's New International Dictionary (2d ed. 1953). It is common knowledge that .10% can be expressed decimally as .001. We could therefore read the definition of "intoxicated" as having an alcohol concentration of .10% or more as meaning having an alcohol concentration of .001 or more. If we then read alcohol concentration as the number of grams per 100 milliliters we would then have .001 grams per 100 milliliters—an extremely low threshold for intoxication, but not gibberish. We do *not* say that this is the proper reading of the statute but only use it as an example to illustrate that the statute is susceptible to different constructions than the two advanced by appellant as the only possibly readings.

We turn now to appellant's other interpretation of the statute: the Legislature intended intoxication to be measured as a ratio of weight to volume, *i.e.*, when the weight in grams reaches .10% of the specified volume, then a person is intoxicated. He then says that this interpretation yields different standards of intoxication depending on whether a person's blood, breath, or urine is tested. He claims that the use of the word "percent" in the definition of "intoxicated," when combined with the definition of "alcohol concentration," means that the statute sets three different levels of intoxication depending on which type of test one takes. Appellant's argument is that a person could drink a certain quantity of alcohol, then take a blood test and register "intoxicated" but, had that same person, under the exact same circumstances, been given a breath test, then that person would not be "intoxicated."

Appellant's reasoning is based on the following set of equations:

(1) Blood

(a) $\dfrac{\text{(grams of alcohol)}}{\text{(100 milliliters)}} = 0.10\% = 0.001$

(b) (grams of alcohol) $= 0.001 \times (100)$

(c) (grams of alcohol) $= .1$ gram

(2) Breath

(a) $\dfrac{\text{(grams of alcohol)}}{\text{(210 liters)}} = 0.10\% = 0.001$

(b) (grams of alcohol) $= 0.001 \times (210)$

(c) (grams of alcohol) $= .21$ gram

(3) Urine

(a) $\dfrac{\text{(grams of alcohol)}}{\text{(67 milliliters)}} = 0.10\% = 0.001$

(b) (grams of alcohol) $= 0.001 \times (67)$

(c) (grams of alcohol) $= .067$ gram

Appellant thus arrives at the conclusion that, since .10% of 210 is .21, then, in order to be "intoxicated" on the basis of a breath test, appellant must show .21 grams of alcohol per 210 liters of breath.

We do not quarrel with appellant's mathematics. Obviously, .10% of 210 is .21. Appellant's basic premise is flawed, however, and ignores the principles of statutory construction that have been discussed above. We do not "read out" portions of a statute in order to attempt to render it unconstitutional. We must endeavor to give all parts of it meaning. Therefore, we cannot read "100" without reading "milliliters of blood"; we cannot read "210" without reading "liters of breath." These numbers are not arbitrary integers. The Legislature had a rational basis for using these particular numbers. Appellant does not challenge the ratios used in the blood-breath equivalence. Once we accept the equivalence between 100 milliliters of blood and 210 liters of breath, any manipulation that depends, as does appellant's, on the denominators in the equation representing *different quantities* must be invalid. One hundred milliliters of blood and 210 liters of breath represent the same thing—that amount of blood and breath that will yield equivalent levels of intoxication in the tissues. Indeed, the law's effect is the opposite of appellant's

contentions. The effect of the statute is to prevent different testing methods from meaning that one has different alcohol levels than the level commonly agreed upon as representing impairment—the .10% blood alcohol level derived from extensive testing of the effect of alcohol on the ability to drive. The law simply allows direct reporting of breath test results in terms of breath, which is much less confusing than the explanation of why a *breath* test was given but *blood* alcohol reported. (For examples of the extensive questioning concerning the blood-breath equivalence, see 1 Erwin § 18.00 and following.)

Appellant's premise is flawed in yet another way. Appellant seems to say that the *setting* of three different levels, varying on the basis of the body substance tested, renders the law unconstitutional. We do not think that the fact that the statute set three different levels—if it did —would, in and of itself, make the statute unconstitutional. The Legislature could have decided to set the level based on breath testing to be higher than that based on blood testing, for example, deciding that it wanted to compensate for any possible inaccuracies in the instruments or the underlying scientific assumptions. Such a distinction would be rational. We doubt that appellant would be arguing that such a choice made the statute too vague.

■ We do not believe that the statute is susceptible to only appellant's interpretations nor do we accept appellant's argument that the statute sets three different levels of intoxication. We are left with the question, implicit in appellant's argument, whether the statute is so confusing as to be overly vague. (Appellant's argument that the statute fails to provide notice is similar to this question and is covered in the second ground of error). That the statute is confusing is not enough to render it unconstitutional. Other statutes are confusing without being unconstitutional. And, perhaps, we should keep in mind that lawyers' minds may create confusion where none would exist in a layperson's mind—the layperson probably has clearly figured out that he had better not "blow a .10" or he has broken the law.

## THE NOTICE AND STANDARDS ARGUMENT

Appellant, by his second ground of error, challenges art. 6701*l*–1 [1983] as being void for vagueness, violating his due process rights under art. I, § 19 of the Texas Constitution, and the Fifth and Fourteenth amendments to the United States Constitution. He contends that art. 6701*l*–1 [1983] violates the two principles set forth in *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983): the offense must be defined so that ordinary people can understand what conduct is prohibited and so that arbitrary and discriminatory enforcement will not be encouraged. A statute must apprise citizens of the nature and character of the act made criminal with sufficient certainty to enable them to avoid doing it.

We note at the outset that appellant apparently challenges all of art. 6701*l*–1 [1983] as being void for vagueness, although his argument focuses on art. 6701*l* –1(a)(2)(B) [1983], the ".10%" definition of intoxication. We begin by disposing of any challenge to the definition of "intoxication" as the loss of the normal use of one's mental or physical faculties by reference to *Parr v. State*, 575 S.W.2d 522 (Tex.Cr.App. 1979) which upheld that language in the definition of "intoxicated" for purposes of manslaughter under Tex.Pen.Code Ann. § 19.05(b) (1974).

■ Appellant advances, as the heart of his argument, reasoning that has been raised in several other jurisdictions. *See, e.g., Fuenning v. Superior Court*, 139 Ariz. 590, 680 P.2d 121 (1983); *Burg v. Municipal Court*, 35 Cal.3d 257, 198 Cal. Rptr. 145, 673 P.2d 732 (1983), *cert. denied*, 466 U.S. 967, 104 S.Ct. 2337, 80 L.Ed.2d 812 (1984); *Coxe v. State*, 281 A.2d 606 (Del. 1971); *Greaves v. State*, 528 P.2d 805 (Utah 1974); *State v. Franco*, 96 Wash.2d 816, 639 P.2d 1320 (1982). He contends that the definition of intoxication based upon chemical levels fails to give adequate notice of

what conduct is criminal because a person of ordinary intelligence cannot tell when their alcohol concentration has crossed the "magic moment" of .10; that there are too many variables involved in alcohol concentration levels (for example, body weight, stomach contents, duration of drinking) for anyone to know, at any given moment, what his alcohol concentration is. Appellant dismisses the treatment of this notice argument in the cases from other jurisdictions as being "slipshod" and "flippant." Basically, however, the only court that has ever found any merit in appellant's argument has been a California appellate court, which has since been overruled by the California Supreme Court. *Burg v. Municipal Court, supra.* As have the above-cited cases, we reject appellant's contention that the statute gives inadequate notice of the proscribed conduct.

■ One particular fallacy pervades the argument attacking ".10%" statutes as being void for failing to give notice of the proscribed conduct. Driving is not protected behavior. Therefore, the concepts of "chilling effect" and "overbreadth" as employed in First Amendment analysis do not apply; that is, the principle that a statute must be struck down because it might *inhibit* protected behavior, although it does not explicitly prohibit it, because the line at which the conduct becomes criminal is fuzzy and the statute could be interpreted to encompass Constitutionally-protected behavior. Appellant claims that it is impossible for ordinary persons to ascertain when their blood alcohol reaches the proscribed point, *i.e.,* to ascertain the exact instant before the line making behavior criminal is crossed. In other words, in order to comply with the statute, appellant might have to inhibit his behavior somewhere short of the exact line at which it is defined as criminal. That is not sufficient to invalidate a statute dealing with unprotected behavior.

The notice requirement that appellant proposes would be more stringent that any ever imposed. The notice required by due process is "fair notice." *Burg v. Munici-*

*pal Court, supra,* 198 Cal.Rptr. at 153, fn. 15, 673 P.2d at 740 fn. 15 and cases cited therein. Appellant's requirement would ultimately invalidate many statutes that depend on an after-the-fact determination as to a defendant's state of mind or the reasonableness of his conduct. *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1272 (1913), quoted in *Burg v. Municipal Court, supra.* That a person may have to make an estimate, and err, as to whether his conduct violates a statute, is not enough to render the statute invalid. *Nash v. United States, supra.* ("The law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree.")

It is a matter commonly known to persons of ordinary intelligence that one must consume more than a small quantity of alcohol to produce a .10% alcohol concentration. *Fuenning v. Superior Court, supra.* The fact that a person has consumed a quantity of alcohol should notify a person of ordinary intelligence that he is in jeopardy of violating the statute. *Id.;* Burg, 198 Cal.Rptr. at 153, 673 P.2d at 740.

Those who drink a substantial amount of alcohol within a relatively short time are given clear warning that to avoid possible criminal behavior they must refrain from driving. *Id.* We do not think that the definition of intoxication in art. 6701*l*–1 [1983] in terms of chemical levels violates due process. We also point out that while there may be a "magic moment" under the .10% definition when behavior becomes criminal—that is, the *per se* section can be invoked only when a .10% or greater level is reached, the converse is not true: an alcohol concentration *below* .10% does not automatically mean a defendant's conduct is not criminal because under the other definition of intoxication, "impairment" is the concern. There is no presumption of sobriety that would exonerate a defendant whose alcohol concentration was less than .10%. As a practical matter, therefore, it is not relevant whether a defendant knows his precise alcohol concentration since maintaining an alcohol concentration

under .10% does not mean that a defendant has avoided criminal conduct.

Appellant also contends that art. 6701*l*-1 [1983] fails the "second prong" of *Kolender v. Lawrence, supra*. He argues that it encourages arbitrary and discriminatory enforcement because it provides no immediately identifiable standards by which an arresting officer can ascertain a violation, leaving no guidelines for the enforcement of art. 6701*l*-1 [1983]. We find appellant's argument under this section a bit confusing and it is difficult to tell exactly what he is attacking. We do not think appellant's real quarrel is with the definitions in art. 6701*l*-1 [1983], however. The statute's definition of intoxication in terms of chemical levels sets a precise standard for enforcement. The definition gives no discretion at all as to what constitutes intoxication. *Burg v. Municipal Court, supra*.

Appellant's real quarrel seems to be about the possibility of cars being arbitrarily and capriciously stopped by the police in the first place, *i.e.*, what is "weaving" from lane to lane to one police officer is not "weaving" to another, so one driver gets stopped while another driver, exhibiting the same behavior, does not. We do not think that this concern can be dealt with by a more precise definition of "intoxication." The general problem of discretion in law enforcement is not before us now.

■ Appellant also complains that the administration of a blood or breath test, involving a trip to the police station, is outside the scope of the permissible search set out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We point out that *Terry* is concerned with the scope of a search pursuant to a stop on less than probable cause. Once we are dealing with the administration of a breath test pursuant to a custodial arrest, we are outside the scope of *Terry*. Appellant makes no claim that he was improperly stopped and we do not see *Terry* as relevant to the determination whether a statute is void for vagueness. We overrule appellant's second ground of error.

Appellant, by his third ground of error, contends that the trial court erred in overruling his motion to quash on the grounds that the indictment failed to put appellant on notice of the manner and means by which he "operated" a motor vehicle, violating his rights under the Fifth and Fourteenth amendments of the United States Constitution, art. I, § 10 and § 19 of the Texas Constitution, and arts. 1.04, 1.05, 21.02–21.04, 21.11, 21.21–21.23 of the Code of Criminal Procedure. Appellant claims that the indictment did not set out the precise physical actions which constituted his operation of the vehicle.

The word "operator" is statutorily defined as one "who is in actual physical control of a motor vehicle." Tex.Rev.Civ. Stat.Ann. art. 6701h–1(7). When terms and elements are statutorily defined, the definitions are essentially evidentiary and need not be further alleged in the indictment. *Ferguson v. State*, 622 S.W.2d 846, 850 (Tex.Cr.App.1980). The instant case is not one in which a necessary act of the accused has more than one statutorily defined means of performance. In such cases, the State, in response to a motion to quash, must specify in the indictment which of the statutory definitions it intends to prove. *Gibbons v. State*, 652 S.W.2d 413 (Tex.Cr. App.1983) (two statutorily defined means of abduction); *Ferguson v. State, supra*, (three statutorily defined ways to deliver heroin).

■ The allegation that appellant "operated" a motor vehicle is adequate to put appellant on notice of the charge against him. The manner and means by which appellant exercised physical control over the vehicle is an evidentiary matter not required for notice and plea in bar. We overrule the third ground of error.

The judgment of conviction is affirmed.