In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1227

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STACY LEE HARDEN, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:11-cr-30238-DRH-1 — **David R. Herndon**, *Judge.*

ARGUED APRIL 10, 2017 — DECIDED AUGUST 7, 2017

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Stacy Lee Harden, Jr., pled guilty to possessing with intent to distribute five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced him to the mandatory minimum imposed by the statute of 10 years' imprisonment and 5 years' supervised release. In imposing that sentence, the court rejected Harden's argument

that the "safety valve" provision in 18 U.S.C. § 3553(f) applied to him, which would allow the court to impose a sentence beneath the mandatory minimums. Harden now appeals that determination to this court.

In October 2010, the Drug Enforcement Administration received information that Harden had transported a large quantity of cocaine from Dallas to the St. Louis area for distribution. After observing him leave a residence in Swansea, Illinois, with a plastic shopping bag and then enter and leave another residence carrying a black bag, they followed him and executed a traffic stop of his vehicle. As they approached his vehicle, Harden sped away at a high rate of speed, traveling through a residential neighborhood in the course of that flight. The flight took place at around 5:30 pm on a Friday. The district court found that he attained speeds that were at least 21 miles per hour (mph) over the 25 mph speed limit which was the requirement to constitute Aggravated Fleeing and Eluding under Illinois state law. Based on the testimony of the officers who pursued Harden, as confirmed by the video evidence of the chase from the officers' cars which revealed the speed as they pursued Harden, the district court also found that the officers pursuing him reached speeds of 65 mph and did not appear to gain ground on Harden, thus indicating that Harden's actual speed neared 65 mph in that 25 mph residential zone. During that time, he threw nearly two kilograms of cocaine out of the vehicle that subsequently were recovered by law enforcement. During the effort to elude his pursuers, Harden turned into a parking lot and made a U-turn, resulting in a collision when the agent's vehicle in pursuit struck Harden's vehicle. The district court credited the officers'

testimony over that of Harden that Harden pulled into the lot to avoid a traffic backup and made a sudden U-turn in an apparent attempt to continue his flight. After the collision, the officers pulled Harden from the vehicle, which continued to move forward as his foot released the brake. Harden was uncooperative with the police as he was arrested at that time.

Harden filed an earlier appeal in this case, and we granted his request to vacate his guilty plea as improperly taken by a magistrate judge. *United States v. Harden*, 758 F.3d 886 (7th Cir. 2014). On remand, he again entered a guilty plea, but without a plea agreement. With a total offense level of 29 and criminal history category I, and a reduction for acceptance of responsibility, the Guidelines range was 87–108 months but with a statutory minimum of 10 years which the district court imposed.

Harden raises only one challenge to his sentence—that the court erred in determining that he was not eligible for the "safety valve" in § 3553(f). Section 3553(f) provides that for certain offenses including the one here under 21 U.S.C. § 841:

> the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

*(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;*

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course

> of conduct or of a common scheme
> or plan, but the fact that the defen-
> dant has no relevant or useful
> other information to provide or
> that the Government is already
> aware of the information shall not
> preclude a determination by the
> court that the defendant has com-
> plied with this requirement.

[emphasis added]

The Probation Office in the Presentence Investigation Report (PSR) concluded that Harden was ineligible for the two-level safety valve reduction because he could not demonstrate that he did not use violence or the threat of violence as set forth in § 3553(f)(2). The district court agreed with that assessment, concluding that the high-speed flight through the residential area resulting in the U-turn and the collision with the police vehicle constituted an act of violence. We review the district court's fact findings regarding the safety valve provision of the Guidelines for clear error, and the interpretation of the safety valve provision *de novo*. *United States v. Alvarado*, 326 F.3d 857, 860 (7th Cir. 2003).

The Guidelines do not define the terms "use of violence or the threat of violence," and Harden urges that the term "use" requires "active employment," and that a defendant uses violence only when he "actively" employs force against another that is capable of causing physical pain or injury. Harden's definition does not veer far from the common conception of violence used by the courts in other contexts,

albeit with the inclusion of the modifier "actively" based on his interpretation of the word "use" as a term of art. The problem, however, inheres in Harden's application of that definition, under which the standard is met only if Harden purposefully used his vehicle to physically strike the officers. Harden asserts that he did not "actively" employ the vehicle as a weapon to inflict force capable of causing pain because he did not intentionally hit anyone and thus there is no evidence that he used the car as a weapon. Under his restrictive interpretation of the terms, only the active employment of violent physical force against another person would suffice. Accordingly, he stated in his brief and at oral argument that if a defendant purposefully slammed on his brakes while being closely pursued by the police, resulting in a collision, that would not satisfy the requirement that he actively employed violent physical force; he reasons that although the element of force might be present in those circumstances, he could not be said to have used violence because he would instead be the recipient of the violence. Finally, Harden argues that his conduct did not constitute a threat of violence. He asserts that there is no threat of violence because his purpose was simply to escape and not to inflict violence on others, and that the reference to "threat of violence" in the safety valve provision should be limited to a communicated intent to inflict harm rather than including actions that place persons in a position of danger.

We decline to interpret "use of violence or threat of violence" so narrowly, as it is contrary to a common understanding of what constitutes violent conduct, inconsistent with the interpretation of those terms in other contexts, and inappropriate given the context of the safety valve provision. That safety

valve provision allows the district court to impose a sentence below the statutory minimum in cases in which the listed characteristics are met and which take the case out of the ordinary run of cases; a tortured parsing of the language to include only a very narrow band of the spectrum of conduct that is commonly considered "violent" is particularly inappropriate in the context of authorizing a deviation below the statutory minimum. And Harden's proposed definition, at least as he would apply it, would except a range of the type of conduct that would undeniably be considered violent conduct by any straightforward reading of that term. For instance, the distinction between Harden causing a collision by sudden deceleration or by rapid acceleration, with only the latter constituting violent conduct, is an interpretation that defies a common-sense understanding of the term. The purposeful abrupt braking with the police in close pursuit would cause a collision just as surely as would the acceleration into the police vehicle, and the term "use of violence" cannot be reasonably interpreted to draw such a tortured distinction based on a vague concept of active use of physical force. Similarly, at oral argument, when presented with the scenario of a defendant pointing a gun and firing in the direction of the police but missing, Harden's attorney declared that the conduct would be a threat of violence rather than characterize it as a use of violence. That defies common understanding. Although displaying a gun might in common parlance be considered a threat of violence, a person actually shooting a gun at others would by common understanding be considered to be engaged in violent conduct. See *Bailey v. United States*, 516 U.S. 137, 148 (1995)("[t]he active-employment understanding of 'use'

certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm.") But under Harden's approach, a person who fired a gun in the direction of other persons would not commit an act of violence unless the bullet actually struck someone. The fortuity of the outcome does not govern the proper character-ization of the action. And a definition of violence that exempts shooting at others unless the bullet finds its target (or relegates that action to the status of a mere threat), is inconsistent with a common sense understanding of the terms. Further con-founding the matter, when asked whether driving a vehicle—a deadly weapon—at those high speeds through a residential neighborhood would constitute at least a threat of violence like firing a weapon under his definition, Harden's attorney characterized that as merely a risk of harm and not a threat of violence. That distinction is ungrounded. The pointing of a gun may communicate a threat, but the vehicular flight at such high speeds in a residential neighborhood similarly communi-cates a threat in that it conveys the defendant's willingness to put the officer, other drivers, and pedestrians at risk so long as the police continue their pursuit; police officers in such situations in fact have to assess whether to abandon such pursuit in light of the threat posed by the flight to innocents such as motorists and pedestrians, as well as to themselves. There is no principled basis to characterize the shooting of the gun as communicating a threat, but to not also recognize that the high-speed flight communicates a threat as well that continuation of the pursuit may result in physical injury.

Harden's understanding of the terms therefore conflicts with a consistent, plain reading of such terms. In addition, it

conflicts with the interpretation of violence that has been employed in other contexts. For instance, in the Armed Career Criminal Act (ACCA), the term "violent felony" was defined to include any felony that "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). We recently considered that definition of what constitutes violence in *United States v. Enoch*, 2017 WL 3205806 (7th Cir. 2017). In *Enoch*, we held that a robbery statute which included as an element that the defendant, in the course of the robbery, "puts [the victim's] life in jeopardy by the use of a dangerous weapon," categorically established the "use, attempted use, or threatened use of physical force" and therefore was a violent crime. *Id. at *5*. We reaffirmed that "force capable of wounding another or putting the life of another in jeopardy is a force that is capable of causing injury to another person and therefore qualifies as a crime of violence." *Id*. Similarly, in *United States v. Anglin*, 846 F.3d 954, 965 (7th Cir. 2017), we held that a taking of personal property by means of "fear of injury, immediate or future, to his person or property," was an act that necessarily required using or threatening force and therefore was a crime of violence. Accord *United States v. Rivera*, 847 F.3d 847, 849 (7th Cir. 2017)(also addressing the Hobbes Act); *United States v. Armour*, 840 F.3d 904, 909 (7th Cir. 2016)(intimidation—when words or actions would cause an ordinary person to feel threatened, by creating a reasonable fear that resistance or defiance will be met with force—means the threat of force);

*United States v. Ortiz*, 775 F.3d 964, 969 (7th Cir. 2015)(noting that even a single intimidating confrontation is enough to constitute a credible threat). Thus, under *Enoch* and *Anglin*, the use or threatened use of violence is established by conduct that puts the victim's life in jeopardy, or by conduct that creates a fear of injury. Moreover, we have consistently held that a threat can be conveyed with words or actions, and can be direct or implied. See *Armour*, 840 F.3d at 909 (a bank robber need not make an explicit threat; "[c]redibly implying that a refusal to comply with a demand for money will be met with more forceful measures is enough."); *United States v. Cureton*, 845 F.3d 323, 326 (7th Cir. 2017)("a request for ransom necessarily includes at least an implied threat that the kidnapper will use force … if the demand is not satisfied"). The high speed flight with a vehicle—inarguably a deadly weapon capable of causing severe injury—through a residential neighborhood with the police in pursuit similarly puts the life of residents, other motorists, and the pursuers in jeopardy.

In fact, the Court in *Sykes v. United States*, 564 U.S. 1 (2011), overruled by *Samuel Johnson v. United States*, 135 S. Ct. 2551 (2015) ("*Johnson*"), applied that definition of violence to conduct similar to that presented here—vehicular flight. Because the vehicular flight statute did not contain as elements the use or threat of violence, the Court analyzed it under the residual clause definition of violence, which assessed the risk of physical injury to another. Applying that definition, the *Sykes* Court held that fleeing from law enforcement in a vehicle constituted a violent felony. The Court recognized that flight posed a danger of physical harm to the persons in the path of the vehicle, as well as to the law enforcement persons pursuing

them. *Sykes*, 564 U.S. at 10–11. *Sykes* was later abrogated by the Court in *Johnson*, because the Court held that the residual clause (subclause ii) was unconstitutionally vague in light of the standard set forth in the clause, the confusing list of offenses it references as examples, and the categorical nature of the inquiry. The Court reasoned that the residual clause required application of the "serious potential risk" standard to an idealized ordinary case of the crime and such an abstract inquiry offers significantly less predictability than would inhere in applying such a standard to an actual situation. *Johnson*, 135 S. Ct. at 2561. The Court made clear, however, that it "[does] not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly … some matter of degree.'" *Id.*, quoting *Nash v. United States*, 229 U.S. 373, 377 (1913). Therefore, the *Johnson* Court's concerns extended only to categorical determinations under that standard rather than determinations based on the actual individual circumstances. The *Johnson* Court did not negate the reasoning in *Sykes* that vehicular flight can pose a threat to the safety of others and constitute a violent offense. In fact, the *Johnson* Court appears to acknowledge that under some circumstances such vehicular flight may constitute a violent offense but decried the attempt to make that determination categorically. Specifically, the Court questioned how a court using a "common-sense" approach could discern "where the 'ordinary case' of vehicular flight in Indiana lies" along the spectrum which includes "everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's

signal." *Id.* at 2559. The safety valve provision, in contrast, is an individual determination based on the actual facts, rather than a categorical determination, and therefore does not present the concerns recognized in *Johnson*. The district court therefore can determine where on that spectrum the flight lies. The ACCA definition of violent offense comports with a common-sense understanding of violent conduct as the use or threat of physical force against another and is relevant as a guidepost as to a common definition of "violence." It suggests that the court could properly determine that a high speed crime chase constituted the use of violence, under the reasoning of *Sykes* as applied to a specific circumstance rather than a nebulous hypothetical category.

A similar conclusion follows if we consider the meaning of "violence" in other contexts. For instance, in the Fourth Amendment context, in considering whether the deadly force used by the officers was reasonable, courts have similarly considered whether the officers, in the context of vehicular flight, were responding to acts that posed a threat of serious physical harm. The Supreme Court in *Brosseau v. Haugen*, 543 U.S. 194, 199–201 (2004), recognized that depending upon the facts, a person fleeing in a vehicle at high speeds may pose an imminent threat of serious physical harm to other persons including other motorists and the officers themselves. See also *Scott v. Harris*, 550 U.S. 372, 383–84 (2007)(respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present and other motorists and officers in driving at extremely high speeds, swerving around cars, crossing the double yellow lines at times, and running multiple red lights); *Mullenix v. Luna*, 136 S. Ct. 305, 308–13 (2015);

*Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021–22 (2014) (a chase exceeding 100 miles per hour and lasting over five minutes threatened the lives of innocent bystanders). Thus, at a minimum, our cases have consistently recognized that conduct constitutes the use or threat of violence if it involves the use or threat of force capable of injuring another, and includes conduct jeopardizing the life of another by the use of a dangerous weapon. Moreover, courts have repeatedly recognized that vehicular flight may pose such a use or threat of violence.

Here, the district court did not err in holding that Harden's action constituted acts of violence or the threat of violence. Harden traveled at a high rate of speed of between 45 and 65 miles per hour in a 25-mile-per-hour residential zone. We have recognized that a vehicle can constitute a weapon, and a vehicle traveling at those high speeds in a residential area at around 5:30 on a Friday evening poses a very real threat of physical injury to persons in that residential area as well as the agents in pursuit. But here we have even more than high-speed flight through the residential neighborhood. We have a collision—the actual application of physical force. As the district court found, Harden pulled into the lot with the police in close pursuit, and then, rather than pull over and surrender to the pursuing agents, he completed an abrupt U-turn placing him in the path of the pursuing agents and resulting in a collision. That use of the vehicle—a deadly weapon—jeopardized the lives of the officers and therefore involved the use or threat of force capable of injuring another. Accordingly, the district court did not err in holding that the safety valve was inapplicable. The decision of the district court is AFFIRMED.