*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2018 UT 35**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

TRAVIS ROGER TULLEY,
*Appellant.*

No. 20150241
Filed July 25, 2018

On Certification from the Court of Appeals

Third District, Salt Lake
The Honorable Judge Randall N. Skanchy
No. 131905304

Attorneys:

Sean D. Reyes, Att'y Gen., Kris C. Leonard, Asst. Solic. Gen.,
Salt Lake City, for appellee

Alexandra S. McCallum, Scott A. Wilson, Salt Lake City,
for appellant

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and JUDGE TOOMEY joined.

ASSOCIATE CHIEF JUSTICE LEE authored a concurring opinion.

Due to her retirement, JUSTICE DURHAM did not participate herein;
COURT OF APPEALS JUDGE KATE A. TOOMEY sat.

JUSTICE PETERSEN became a member of the Court on
November 17, 2017, after oral argument in this matter
and accordingly did not participate.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Travis Roger Tulley claims that while he was napping on Victim's couch, Victim held a knife to his forehead and attempted to grope his genitals. In response, Tulley violently assaulted Victim, a 71-year-old man. Tulley wanted to introduce evidence at trial of Victim's prior sexual misconduct. The district court excluded much of that evidence, but held that Tulley could present some of it in a "sanitized" form. Tulley also asked the district court to instruct the jury that he would be entitled to defend himself if he was trying to prevent "forcible sexual abuse." The district court declined Tulley's request. The jury convicted Tulley of reckless aggravated abuse of a vulnerable adult and interference with an arresting officer. Tulley received a sentence enhancement because he qualified as a habitual violent offender.

¶2 Tulley challenges the district court's exclusion of Victim's prior sexual misconduct evidence and contends that the jury was incorrectly instructed. Tulley also argues that Utah's aggravated abuse of a vulnerable adult statute is unconstitutionally void. Finally, Tulley contends that Utah's habitual violent offender statute violates the Utah Constitution's cruel and unusual punishment and double jeopardy clauses.

¶3 We conclude that the district court correctly excluded evidence of Victim's prior sexual misconduct and correctly instructed the jury. Additionally, we hold that Utah's aggravated abuse statute is not unconstitutionally vague and conclude that Tulley has not met his burden of establishing that Utah's habitual violent offender statute violates either the Utah Constitution's cruel and unusual punishment clause or the double jeopardy clause. In the end, we affirm the district court.

## BACKGROUND

¶4 Tulley met Victim at the sex offender treatment program they both attended.[1] Victim mentored Tulley during the program, and the two remained in contact afterwards. More than a decade

---

[1] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116 (citation omitted).

after they first met, Victim invited Tulley to his apartment. Over drinks, Tulley explained that he didn't have a place to live. Victim invited Tulley to stay with him for a few days. The next day, the two started drinking again. While making dinner, Tulley accidentally burned his hand on the oven. Victim suggested that Tulley needed to get some sleep and offered Tulley sleeping medication. Tulley took "several" pills while Victim continued drinking. Tulley eventually fell asleep on the couch. Tulley testified that he awoke to find a knife at his forehead and Victim's hand on his genitals. Tulley "started throwing [his] fists." Victim backed away.

¶5 At some point thereafter, Victim's next door neighbor heard "screaming and . . . hollering and . . . swearing" for "at least 15 minutes." She opened her door and saw another neighbor, Ron Boren, trying to enter Victim's apartment. She returned to her apartment and "all of a sudden . . . heard this real loud bumping" behind her bathroom wall. When she hit the wall to try to quiet things down, "it didn't stop . . . [a]nd then it got worse." She heard "consistent thumping in the bathroom" that was "very loud" but couldn't hear any voices inside of Victim's apartment. She called the building manager to report the disturbance.

¶6 Tulley let Boren enter Victim's apartment. Boren found Victim lying in a "big puddle of blood." Boren located a towel, wet it, and placed it on Victim's head. According to Boren, "[t]here was blood everywhere," so he wiped up the blood in the bathroom. When Boren started cleaning the apartment, Tulley became agitated and told Boren, "I'll kill you."

¶7 At this point, the on-site assistant responded to the complaints about the ruckus in Victim's apartment. Tulley and Boren attempted to block the assistant from entering, but eventually she opened the door "a little bit to find [Victim] on the floor." She quickly assessed the apartment and described "a blood bath" with blood "all over kind of semi oozing out a little bit in the kitchen, and bedroom, [and] bathroom."[2] Tulley and Boren then slammed the door on the assistant. The assistant went to an open window to listen and heard Victim tell Tulley that he "loved him like a son." Tulley responded, "I love you too, Dad." Tulley then placed his hands over

---

[2] Victim's living room connected to the kitchen. The living room and kitchen were also connected to a hallway that led to the bathroom and bedroom.

Victim's mouth to muffle him, told him "I'll kill you," and beat Victim with a club.

¶8    At this point, the building manager arrived and walked into Victim's apartment to find Victim "on the floor . . . with a towel wrapped around his head." She saw Tulley, who was not wearing pants, standing in the doorway. Tulley told the manager to "get the hell out." The manager called for an ambulance and the police. Tulley became increasingly agitated and said he would kill Victim. Tulley came across the room and shut the door, forcing the manager out.

¶9    When the police arrived, they walked into "[a] bloody mess." A pair of glasses with bloody lenses sat on the kitchen table. Blood was "smeared on the walls [and] smeared all over the floor" in the hallway. The police found two of Victim's teeth on the bedroom floor. Between the bedroom and the bathroom, they found a golf club with a "brownish substance" on it. In the bathroom, they found blood on the floor, blood spatters on the wall, and wet, bloody towels. A bloody towel rack had been pulled from the wall with the brackets still attached. A bloody, broken, wooden spoon lay near it. Smeared blood stained the sink. The shower curtain had been pulled down. Blood covered the bathtub.

¶10 The police found Victim lying in a pool of blood. He had blood "all over him" and "was lying prone on the floor not moving." One officer thought Victim had been killed because of the extent of his facial injuries.

¶11 Meanwhile, Tulley was sitting in the bedroom, drunk, with blood on his hands, face, and clothing, holding a gallon-sized container of liquor in one hand and a 20-ounce beer can in the other. Tulley screamed at the police to get out and attempted to hit the officer with the bottle and the beer can. The police temporarily incapacitated Tulley with a Taser and handcuffed him.

¶12 After his arrest, Tulley requested that police officers photograph his face to document a cut where Tulley claimed Victim had held the knife. An officer took the photo, but "didn't see anything at that spot."[3]

¶13 Victim arrived at the hospital covered in blood and in serious condition. He had multiple facial lacerations that required

---

[3] Another officer testified that she noticed "a little scrape [or] . . . a cut."

plastic surgery. Victim's eyes were swollen shut and one of his eyeballs was bruised. His nasal bone, nasal septum, and eye sockets were fractured. His sinuses were fractured and filled with blood.

¶14 Emergency room doctors diagnosed Victim with a traumatic brain injury and concluded that there was "a reasonable risk that he would die" from the injuries he sustained. Victim remained in the hospital for nearly two days. At the recommendation of his doctor, Victim was placed in a skilled nursing facility after discharge from the hospital.

¶15 The State charged Tulley with intentional aggravated abuse of a vulnerable adult, failure to register as a sex offender, and interference with an arresting officer. Tulley claimed he was justified in using force against Victim to prevent death or serious bodily injury, or to prevent the commission of forcible sexual abuse.

¶16 Before his trial, Tulley sought to introduce evidence of several phone calls Victim made to Tulley's sister which she described as sexual and "disgusting." The district court denied Tulley's motion. Tulley also sought to introduce evidence of Victim's numerous prior convictions for rape and sodomy of women and children. The convictions had occurred between 1959 and 1985. Tulley also wanted to introduce evidence that Victim returned to prison in 1992 after engaging in sexual activity with a male roommate while on parole.

¶17 Tulley argued that this evidence could be admitted for three non-character purposes under Utah Rule of Evidence 404(b): (1) to demonstrate the reasonableness of his response; (2) to demonstrate Victim's motive to sexually assault Tulley; and (3) to demonstrate that Victim had expressed "some confusion about his sexual orientation."

¶18 The district court concluded that "based upon 404(b) associated with at least the absence of mistake or motive and/or intent . . . being the fact that this is something that has a history with [Victim], at least in one period of time, [the evidence Tulley wanted to introduce] certainly falls within what might otherwise be the exception under 404(b)." The court granted Tulley's motion "to a very limited extent . . . . to indicate that there is some sort of history of . . . confusion associated with sexual preference and sexually acting out." The court explained that rule 403 "suggests that although I'm letting this evidence in, I'm only letting it in, in a sanitized fashion . . . ."

¶19 Tulley also proposed a jury instruction to explain his self-defense theory:

> Travis Tulley is justified in using force against [Victim]
> when and to the extent that Travis Tulley reasonably
> believed that force was necessary to defend himself
> against [Victim's] imminent use of unlawful force
> against him. Travis Tulley was also justified in using
> force intended or likely to cause death or serious bodily
> injury against [Victim] if he reasonably believed that
> such force was necessary to prevent death or serious
> bodily injury to him as a result of [Victim's] imminent
> use of unlawful force, or to prevent the commission of
> a forcible felony, *including forcible sexual abuse.*

(Emphasis added). The district court accepted the standard portion of the instruction, which included all of the language Tulley proposed except for the phrase "including forcible sexual abuse." The court explained that it would not "make caveats and interlineations to address" forcible sexual abuse, because the jury instruction is "broad enough to incorporate it and you may argue from that, of course, that indeed this is exactly what [the self-defense] statute contemplates . . . ."

¶20 Tulley also objected to one of the State's instructions, arguing that it was unconstitutionally vague. The State's proposed instruction defined "serious physical injury":

> "Serious physical injury" means any physical injury or
> set of physical injuries that:
>
> a. Seriously impairs a vulnerable adult's health;
>
> b. Was caused by the use of a dangerous weapon;
>
> c. Involves physical torture or causes serious
>    emotional harm to a vulnerable adult; or
>
> d. Creates a reasonable risk of death.

Tulley objected to the language "[s]eriously impairs a vulnerable adult's health" and argued "it is impossible to determine what the language means." Tulley argued that the statute is "void for vagueness and unconstitutionally vague." The district court overruled Tulley's objection and explained that "two experts testif[ied] in this particular case, both associated with what it does or doesn't mean or what the understanding of common usage may be associated with impairment."

¶21 Tulley testified at trial. He explained that after he woke up and felt Victim's hands on his "phallus and . . . scrotum[,]" he "started throwing [his] fists," and estimated that he hit Tulley four or

five times. Tulley did not have pants on, and said that he had "no memory . . . or knowledge" of how they were removed. He said he hit Victim because he could only see part of Victim's face "from the knife that was straight pointing at me." When Tulley started "cussing" at Victim, Tulley said Victim went into the bathroom, at which point Tulley grabbed the knife and threw the knife in the sink. Tulley said he then went to the bedroom and remembered "getting down on the ground and . . . kind of pounding [his] fists as [he] was kneeling to the ground." He fell asleep in the bedroom, but later awoke when he heard a noise in the bathroom.

¶22 Tulley testified that he went to the door and saw Victim's "feet and . . . legs protruding out" from the bathroom, and then found Victim with blood pooled around him, "moving around in it." When he tried to talk to Victim, Tulley said that Victim told him to leave him alone. Tulley ignored Victim's request. Tulley testified that he picked Victim up from the bathroom floor, but dropped him because a dog bite had "totally destroyed" his left hand in the months preceding the incident. Tulley said he had Victim's blood on his body from attempting to lift him up and got more blood on his hands after trying to lift Victim a second time. When he couldn't lift Victim, Tulley explained that he started "flicking [his] hands" because of the blood on him.

¶23 Tulley said he took "a handful" of pills out of Victim's medicine cabinet that contained both sleeping and pain medications and "chugged" out of a bottle of liquor in the kitchen. Tulley testified that he drank half of the gallon bottle and that he did not remember what happened next, but when he came to, he was in the bedroom leaning against the bed, at which point Boren knocked on the door. Tulley explained that after Boren entered and the building manager arrived, he drank the rest of the gallon liquor bottle. He testified that the next thing he remembered was being tased.

¶24 The jury convicted Tully of reckless aggravated abuse of a vulnerable adult, a third degree felony, and interference with an arresting officer, a class B misdemeanor. Tulley pled guilty to failure to register as a sex offender, a third degree felony. Because Tulley had two prior convictions for violent offenses, his reckless aggravated abuse of a vulnerable adult charge carried a potential enhancement to a first degree felony. *See* UTAH CODE § 76-3-203.5(2).

¶25 On the day of sentencing, Tulley's counsel filed a motion challenging the constitutionality of the habitual violent offender statute. Tulley argued that the statute twice placed him in jeopardy contrary to the Fifth Amendment of the United States Constitution

and article I, section 7 of the Utah Constitution. Tulley also posited that the statute subjected him to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and article I, section 9 of the Utah Constitution. The district court denied Tulley's motion. Tulley received a sentence enhancement to a first degree felony sentence, but he also received a sentence reduction, resulting in an overall enhancement to a second degree felony sentence. Tulley appeals.

## ISSUES AND STANDARDS OF REVIEW

¶26 Tulley raises four issues on appeal. First, Tulley contends that the district court abused its discretion when it excluded evidence of Victim's history of sexual misconduct. Most decisions to admit or exclude evidence "involve a threshold statement of the legal principle governing admission or exclusion, findings of fact pertinent to a determination, and the application of the legal principle to the facts at hand with regard to admissibility." *Arnold v. Grigsby*, 2018 UT 14, ¶ 9, 417 P.3d 606. "We review the legal questions to make the determination of admissibility for correctness." *Id.* (citation omitted). And we review a district court's ultimate decision to admit or exclude evidence for an abuse of discretion. *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032. A district court "abuses its discretion only when 'its decision to admit or exclude evidence is beyond the limits of reasonability.'" *Id.* (citation omitted).

¶27 Second, Tulley contends that the district court erred in failing to instruct the jury that the term "forcible felony" includes sexual offenses. "Whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444.

¶28 Third, Tulley contends that the definition of "serious physical injury" set forth in the aggravated abuse of a vulnerable adult statute, and adopted by the district court in the jury instructions, "rests on provisions that are void-for-vagueness both facially and as-applied."

¶29 Finally, Tulley contends that Utah's habitual violent offender statute violates the Utah Constitution's cruel and unusual punishment and double jeopardy clauses. A statute's constitutionality is a question of law that we review for correctness, giving no deference to the district court. *State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171.

## ANALYSIS

### I. Evidence of Prior Sexual Misconduct

¶30 Tulley first contends that the district court abused its discretion when it excluded evidence of Victim's history of sexual misconduct. Tulley argues that the evidence "was central to the plausibility of [his] testimony. . . . Not only did it shed light on [Victim's] motivations in committing a sexual attack, but it also demonstrated the reasonableness of Tulley's response."

¶31 Tulley sought to introduce the following evidence of Victim's criminal past: a 1959 sexual assault conviction; a 1961 conviction for rape of a 17-year-old girl; a 1969 conviction for rape of a 14-year-old girl; a 1973 conviction for attempted rape of a 19-year-old woman; a 1979 conviction for "contributing to the sexual delinquency" of a 14-year-old boy; a 1979 conviction for sodomy of a woman; an arrest for sexual offenses against a 14-year-old and 15-year-old boy around 1985; and evidence that Victim "sexually acted out with a roommate" during treatment while he was on parole, and returned to prison.

¶32 Tulley also sought to introduce evidence of the sexually explicit phone calls that Victim made to Tulley's sister in the months preceding the assault.

¶33 As an initial matter, the district court ruled orally from the bench and the court's rationale is not entirely clear.[4] It appears that the district court concluded that the evidence "certainly falls within what might otherwise be an exception under 404(b)." But the court then referenced Utah Rule of Evidence 403 in holding that "[w]e are not going back to the 60's and the 70's, but simply to indicate that there is some sort of history . . . of confusion associated with sexual preference and sexually acting out." Therefore, the court said that

---

[4] This should not be read as a criticism of the district court, because it isn't. We know that district courts must make a multitude of decisions in the course of a trial and frequently will not have the time to issue a written decision. We reference the oral ruling only to illustrate why the record does not provide us with tremendous visibility into the basis for the district court's decision.

the evidence would be admitted in a sanitized form, but "how we sanitize that in some way, I'm not certain."[5]

¶34 The rationale behind the district court's rule 403 decision appears to be rooted in its concern about the age of the evidence and the risk of unfair prejudice. While discussing the convictions "from the 60's and 70's," the court explained that Utah Rule of Evidence 609 "has to apply by way of a guideline associated with what might otherwise be stale on old claims."[6]

¶35 "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." UTAH R. EVID. 404(b)(1). This evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). Even then, under rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

---

[5] It appears that this ruling did not apply to the evidence of the dirty phone calls Victim made to Tulley's sister. With respect to those, the district court concluded that they would not be admitted, apparently on relevance grounds. Tulley claims this decision falls outside the bounds of the district court's discretion. We disagree, but affirm the district court on an alternative ground. *See Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225 ("[I]t is well settled that an appellate court may affirm the judgment appealed from 'if it is sustainable on any legal ground or theory apparent on the record . . . .'" (citation omitted)). On the spectrum of unacceptable conduct, a chasm lies between Victim's obscene phone calls—the specifics of which were not proffered—and sexually assaulting someone at knife point. The probative value of the phone calls—if any—is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. *See* UTAH R. EVID. 403. Accordingly, the district court did not abuse its discretion by excluding this evidence.

[6] Under Utah Rule of Evidence 609(b), evidence of a prior conviction that is older than ten years and used to attack a witness's character for truthfulness is only admissible if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect . . . ."

wasting time, or needlessly presenting cumulative evidence." *Id.* 403. "[U]nfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis." *State v. Reece*, 2015 UT 45, ¶ 69, 349 P.3d 712 (citation omitted). To determine whether it will admit evidence under rule 403, the court must "bind its analysis to the text of rule 403, considering those factors that are appropriate given the particular circumstances of the case." *State v. Lowther*, 2017 UT 34, ¶ 45, 398 P.3d 1032.

¶36 Although Tulley was not using Victim's prior sexual misconduct for impeachment purposes, the district court's invocation of rule 609 suggests that it had some concern about the age of the evidence. Tulley argues that the district court improperly relied on rule 609. But we do not read the ruling that way. It does not appear that the court believed that rule 609 applied or compelled a decision. Rather, it appears that the court mentioned rule 609 to illustrate that evidence of acts from decades ago might possess little probative value.

¶37 Tulley argues that the evidence "revealed [Victim] was motivated by sexual opportunism, ambivalence, and deviancy, which supported Tulley's narrative and explained why [Victim] would sexually attack a stronger, younger male friend." Tulley also argues that his "knowledge that [Victim] was a convicted rapist explained why Tulley would be fearful of [Victim] notwithstanding [Victim's] age and stature."

¶38 The district court was within its broad discretion in finding that the probative value of Victim's prior sexual misconduct to demonstrate motive or intent to attack Tulley or to show that Tulley had a basis to fear Victim was low. None of Victim's prior acts resembled his attack on Tulley—a majority of Victim's prior victims were female, and those who were male were minors.[7] And, as the district court noted, they were decades in Victim's past.

¶39 And, whatever limited probative value the evidence might contain was substantially outweighed by the danger of unfair

---

[7] The record does not reveal the sex or age of the victim in the 1959 conviction. The State asserts all of Victim's crimes were perpetrated against women or minors—an assertion Tulley does not dispute. Even if that single conviction involved an adult male, the age of conviction, coupled with the lack of details about the assault, would not change our conclusion that the district court did not abuse its discretion.

prejudice. Many of Victim's instances of prior misconduct involved sexual crimes against children; crimes with a propensity to stir strong feelings. The district court could properly conclude that presenting evidence of these acts may have confused the issues or mislead the jury, thus encouraging the jury to decide "upon an improper basis." *Reece*, 2015 UT 45, ¶ 69 (citation omitted); *see also* UTAH R. EVID. 403. Accordingly, the district court did not abuse its discretion when it excluded evidence of Victim's prior sexual misconduct.

¶40 Moreover, the district court allowed Tulley to present evidence of Victim's "confusion associated with sexual preference and sexually acting out . . . . in a sanitized fashion." At trial, Tulley chose not to introduce this evidence. Accordingly, even if the district court abused its discretion, Tulley would be hard-pressed to demonstrate that the court's exclusion prejudiced him when he did not attempt to introduce the evidence in the manner the district court ruled he could.

## II. Forcible Felony Jury Instruction

¶41 Tulley next contends that the district court erred by failing to instruct the jury that the term "forcible felony"—when used to explain when a person may legally defend himself—includes sexual offenses. Specifically, Tulley argues that the district court should have expanded the definition of "forcible felony" to clarify for the jury that the term includes sexual offenses such as forcible sexual abuse.

¶42 "A person is justified in using force intended or likely to cause death or serious bodily injury only if the person reasonably believes that force is necessary to prevent death or serious bodily injury to the person . . . as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony." UTAH CODE § 76-2-402(1)(b). The self-defense statute defines forcible felony:

> (a) For purposes of this section, a forcible felony includes aggravated assault, mayhem, aggravated murder, murder, manslaughter, kidnapping, and aggravated kidnapping, rape, forcible sodomy, rape of a child, object rape, object rape of a child, sexual abuse of a child, aggravated sexual abuse of a child, and aggravated sexual assault . . ., and arson, robbery, and burglary . . . .
>
> (b) Any other felony offense which involves the use of force or violence against a person so as to create a

substantial danger of death or serious bodily injury also constitutes a forcible felony.

(c) Burglary of a vehicle . . . does not constitute a forcible felony except when the vehicle is occupied at the time unlawful entry is made or attempted.

*Id.* § 76-2-402(4).

¶43 Tulley argues that although section 402(4) does not explicitly list "forcible sexual abuse" as a forcible felony, "the statutory term 'includes' is an 'established term of art' indicative of a 'partial list.' Thus, section 76-2-402's enumerated list of offenses is non-exhaustive . . . ." (Citations omitted).

¶44 We agree. "[*I*]*ncluding* is an established term of art with an established meaning. In statutory cases far and wide, the term is routinely construed as introducing a non-exclusive, exemplary list." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 53, 345 P.3d 619 (citation omitted). "To *include* is to embody or encompass . . . ." *Id.* Accordingly, we read the list of examples of acts amounting to a forcible felony as a non-exhaustive list. However, this non-exhaustive list is not without limitation because section 76-2-402(4)(b) restricts the types of crimes that may be considered a forcible felony.

¶45 This is apparent from the statute's structure. Section 402(4)(a) says that "forcible felony" includes eighteen enumerated crimes that constitute a forcible felony. If the statute stopped there, Tulley might have a persuasive argument. But the statute further describes a forcible felony as "[a]ny other felony offense which involves the use of force or violence against a person so as to create a substantial danger of death or serious bodily injury." UTAH CODE § 76-2-402(4)(b).

¶46 Section 402(4)(b) would be meaningless unless it is read to limit the types of felonies that can be included in the category of forcible felonies. Accordingly, we conclude that although section 402(4)(a) provides a non-exhaustive list of felonies, section 402(4)(b) describes the types of crimes that can be added to that non-exhaustive list. And that those crimes "involve[] the use of force or violence against a person so as to create a substantial danger of death or serious bodily injury . . . ." *Id.*

¶47 In some circumstances, the commission of forcible sexual abuse can create a substantial danger of serious bodily injury. A person commits forcible sexual abuse if:

> [T]he victim is 14 years of age or older and, *under circumstances not amounting to rape, object rape, sodomy, or attempted rape or sodomy*, the actor touches the anus, buttocks, or any part of the genitals of another, or touches the breast of a female, or otherwise takes indecent liberties with another, or causes another to take indecent liberties with the actor or another, with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person, without the consent of the other, regardless of the sex of any participant.

UTAH CODE § 76-5-404(1) (2017) (emphasis added).[8]

¶48 The definition of forcible sexual abuse contemplates two degrees of the crime: one where a defendant causes serious bodily injury to another and one that does not. *Id.* § 76-5-404(2). Forcible sexual abuse is a first degree felony when a defendant causes serious bodily injury to another during the commission of the forcible sexual abuse. *Id.* § 76-5-404(2)(b). If the defendant does not cause serious bodily injury, forcible sexual abuse is a second degree felony. *Id.* § 76-5-404(2)(a).

¶49 As explained above, for self-defense purposes, forcible felonies are limited to eighteen enumerated crimes and crimes that "involve[] the use of force or violence against a person so as to create a substantial danger of death or serious bodily injury . . . ." *Id.* § 76-2-402(4)(b). And because of the two variants of forcible sexual abuse, it is possible for an actor to commit the crime in a manner that may create a substantial danger of death or serious bodily injury, and in a manner that does not. The degree of risk, and the defendant's perception of that degree of risk dictate whether or not a defendant was justified in using force intended or likely to cause death or serious bodily injury. In other words, a defendant may be justified to use deadly force to prevent forcible sexual abuse that the defendant reasonably believes is necessary to prevent death or

---

[8] This section was amended in 2018. *See* 2018 Utah Laws ch. 192. The amendment replaced the word "person" with "individual," adds "pubic area" to the list of body parts encompassed by the statute, and removes "or causes another to take indecent liberties with the actor or another" from the statute. Neither party analyzed the effect of the new statute, nor are the amendments relevant to our analysis. Accordingly, we cite to the 2017 version of the statute.

serious bodily injury, but cannot use such force to prevent forcible sexual abuse that the defendant does not reasonably believe presents such a risk.[9]

¶50 That distinction assumes importance here because if Victim had a knife, Tulley might be justified in using deadly force to prevent the attack. And the jury was properly instructed in that regard. The instruction told the jury that if Tulley reasonably believed that "the force [was] necessary to prevent death or serious bodily injury," he was justified in using force to defend himself. Tulley wanted the district court to go one step further and include language in the instruction that suggested forcible sexual abuse would always present a danger of death or serious bodily injury. For the reasons we have just discussed, that is not a correct statement and Tulley's proposed amendment to the instruction would have misstated the law. Accordingly, the district court did not err in instructing the jury.

---

[9] The Legislature's logic becomes clear when we step back from the definitions to look at the larger statutory scheme. In section 76-2-402, the Legislature defines when the law will allow someone to use deadly force. The specifically enumerated crimes are those that carry a high risk of a victim suffering death or serious bodily injury. The Legislature listed a number of crimes that fell into that category and added the catch-all in section 76-2-402(4)(b) to ensure that no similar crime was left out.

The Legislature also defined two types of "forcible sexual abuse." The first prong includes "forcible sexual abuse" as a second degree felony and excludes those crimes—like rape and object-rape—that present the possibility of a likelihood of death or serious bodily injury. UTAH CODE § 76-5-404(1), (2)(a). The second prong defines "forcible sexual abuse" as a first degree felony in circumstances where the defendant "caused serious bodily injury to another." *Id.* § 76-5-404(2)(b). This specifically carves out a category of forcible sexual abuse where there may be no substantial danger of death or serious bodily injury and a category where there is a substantial danger of serious bodily injury. Because the Legislature made a policy choice that deadly force can only be legally used when a defendant reasonably believes that force is necessary to prevent death or serious bodily injury, deadly force may not be used to ward off the variant of forcible sexual abuse that does not threaten death or serious bodily injury.

### III. The Aggravated Abuse of a Vulnerable Adult Statute

¶51 Tulley next contends that "[t]he definition of 'serious physical injury' set forth in the aggravated abuse statute rests on provisions that are void for vagueness both facially and as-applied."[10] Tulley argues that a recent United States Supreme Court case, *Johnson v. United States*, 135 S. Ct. 2551 (2015), "clarified that when bringing a facial challenge, a defendant need not demonstrate a statute's vagueness in all of its applications." Tulley urges us to conclude that under *Johnson*, certain statutory provisions are facially vague even if they are not vague when applied to a defendant's specific conduct. And Tulley argues that even if we disagree with his

---

[10] Tulley levels arguments against subsections (i), (iii), and (iv) of the definition of serious physical injury. *See* UTAH CODE § 76-5-111(q). Tulley acknowledges that his challenge to subsections (iii) and (iv) are unpreserved, but argues that "the vagueness of subsections (iii) and (iv) should have been obvious because counsel's objection to subsection (i) placed the court on notice that other portions of the statute were similarly vague." In other words, Tulley asks us to review these unpreserved arguments under the plain error exception to our preservation rules. This stretches plain error further than we have ever extended it. We have never held that a district court commits plain error when it fails to interpret a constitutional objection to one subsection as an objection to all subsections.

Moreover, to demonstrate plain error, a defendant must establish that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant . . . ." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (alteration in original) (citation omitted). "If any one of these requirements is not met, plain error is not established." *State v. Dunn*, 850 P.2d 1201, 1209 (Utah 1993).

As our discussion below demonstrates, *infra* ¶¶ 51–73, the law in this area was not plainly settled at the time Tulley objected to the statute on constitutional grounds. *See State v. Dean*, 2004 UT 63, ¶¶ 17–18, 95 P.3d 276 (holding that an error was not obvious and therefore not plain when "the law in [the particular] area was not sufficiently clear or plainly settled . . . with respect to both Utah and federal case law"). Because any vagueness in subsections (iii) and (iv), even assuming that these provisions are vague, would not have been obvious to the district court, Tulley cannot establish plain error. We will not review his unpreserved arguments.

reading of *Johnson*, the aggravated abuse of a vulnerable adult statute is vague as applied to him.

¶52 An individual is guilty of aggravated abuse of a vulnerable adult if, "[u]nder any circumstances likely to produce death or serious physical injury, [that] person, including a caretaker, . . . causes a vulnerable adult to suffer serious physical injury . . . ." UTAH CODE § 76-5-111(2).

¶53 The statute defines "[s]erious physical injury" as

any physical injury or set of physical injuries that:

> (i) seriously impairs a vulnerable adult's health;

> (ii) was caused by use of a dangerous weapon as defined in Section 76-1-601;

> (iii) involves physical torture or causes serious emotional harm to a vulnerable adult; or

> (iv) creates a reasonable risk of death.

*Id.* § 76-5-111(1)(q). "Physical injury" includes:

skin bruising, a dislocation, physical pain, illness, impairment of physical function, a pressure sore, bleeding, malnutrition, dehydration, a burn, a bone fracture, a subdural hematoma, soft tissue swelling, injury to any internal organ, or any other physical condition that imperils the health or welfare of the vulnerable adult and is not a serious physical injury as defined in this section.

*Id.* § 76-5-111(1)(o).

¶54 To survive a vagueness challenge, a criminal statute must "(1) 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement,' and (2) 'establish minimal guidelines' that sufficiently instruct law enforcement [so] as to avoid arbitrary and discriminatory enforcement." *State v. Holm*, 2006 UT 31, ¶ 77, 137 P.3d 726 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)).

¶55 The United States Supreme Court has instructed that when a party raises both facial and as-applied vagueness challenges, "[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). This is because "[a] plaintiff who engages in some conduct that is clearly

proscribed [by statute] cannot complain of the vagueness of the law as applied to the conduct of others." *Id.*

¶56 Tulley contends that *Johnson* altered that general framework. Specifically, Tulley argues that post-*Johnson*, it is permissible to analyze the facial challenge first and, in fact, strike the statute as unconstitutionally vague, even if the statute might not be vague when applied to the case at hand.

¶57 *Johnson* examined the Armed Career Criminal Act of 1984 (the ACCA). 135 S. Ct. at 2555. The ACCA enhances the sentences of restricted individuals who "ship, possess, and receive firearms" and who also have "three or more earlier convictions for a 'serious drug offense' or a 'violent felony.'" *Id.* (citation omitted). The ACCA defines "violent felony," in part, as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, involves the use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." *Id.* at 2555–56 (first omission in original) (quoting 18 U.S.C. § 924(e)(2)(B)). The Supreme Court held that the "indeterminacy of the wide-ranging inquiry required by" the italicized language, known as the statute's residual clause, "denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.* at 2557.

¶58 The Supreme Court concluded that two features of the ACCA's residual clause "conspire[d] to make it unconstitutionally vague." *Id.* First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558.

¶59 The residual clause requires a court to employ what is known as the "categorical approach," in which the court examines "the ordinary case of [a] defendant's crime" and not "the particular conduct in which the defendant engaged . . . ." *Id.* at 2561–62. Under the categorical approach, "courts identify 'the minimum criminal conduct necessary for conviction under a particular statute'" and "look only to the statutory definitions—*i.e.*, the elements of [the] . . . offense[], and *not* to the particular [underlying] facts."

*United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (alterations in original) (omission in original) (citations omitted).[11]

¶60 The ACCA's residual clause requires a sentencing court "to look only to the fact that [a] defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions," and thus requires the use of the categorical approach. *Taylor v. United States*, 495 U.S. 575, 600–02 (1990). With respect to the ACCA, "[u]nder the categorical approach, a court assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.'" *Johnson*, 135 S. Ct. at 2557 (citation omitted).

¶61 Although the Supreme Court bypassed the traditional as-applied inquiry in *Johnson*, it also clarified that it "d[id] not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Id.* at 2561 (omission in original) (citation omitted). In other words, the Court appeared to limit *Johnson* to statutes that require courts to employ the categorical approach.

¶62 This interpretation of *Johnson* has been adopted by each federal circuit court to address the issue. *See United States v. Harden*, 866 F.3d 768, 773 (7th Cir. 2017) ("[T]he *Johnson* Court's concerns extended only to categorical determinations under that standard

---

[11] A common example is a statute involving crimes of moral turpitude. A conviction for a crime of moral turpitude can have immigration consequences. Pooja R. Dadhania, *The Categorical Approach for Crimes Involving Moral Turpitude After Silva-Trevino*, 111 COLUM. L. REV. 313, 313 (2011). The Department of Justice and federal courts of appeals routinely use the categorical approach to determine whether a conviction for a particular offense constitutes a crime of moral turpitude. *Id.* at 314. "The categorical approach focuses on the elements of the criminal conviction, rather than the acts underlying the conviction, to determine whether a particular conviction constitutes a [crime of moral turpitude] for immigration purposes." *Id.* "The categorical approach considers whether moral turpitude necessarily inheres in the elements of the offense for which the noncitizen was convicted, *without considering her actual actions*." *Id.* (Emphasis added).

rather than determinations based on the actual individual circumstances."); *United States v. Prickett*, 839 F.3d 697, 700 (8th Cir. 2016) ("[T]he Supreme Court was clear [in *Johnson*] in limiting its holding to the particular set of circumstances applying to the ACCA residual clause . . . ."(citation omitted)); *Shuti v. Lynch*, 828 F.3d 440, 449 (6th Cir. 2016) (acknowledging that *Johnson* does not apply to cases that "call for the application of a qualitative standard such as 'substantial risk' to real-world conduct," but nonetheless striking down the challenged statute because it "mandate[d] a categorical mode of analysis that deal[t] with 'an imaginary condition other than the facts'" (citations omitted)); *United States v. Nastri*, 647 F. App'x 51, 55 (2d Cir. 2016) (In *Johnson* "the Supreme Court specifically noted that it did 'not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to *real-world conduct.*' Whether a defendant's actual two-year drug-distribution conspiracy falls within the scope of 'a substantial period of time' is precisely this kind of qualitative standard." (quoting *Johnson*, 135 S. Ct. at 2561)); *Dimaya v. Lynch*, 803 F.3d 1110, 1116 (9th Cir. 2015) ("In many circumstances, of course, statutes require judges to apply standards that measure various degrees of risk. The vast majority of those statutes pose no vagueness problems because they 'call for the application of a qualitative standard such as "substantial risk" to real world conduct.' The statute at issue in *Johnson* was not one of those statutes, however. Nor is the provision at issue here." (footnote omitted) (citations omitted)); *United States v. Schofield*, 802 F.3d 722, 731 (5th Cir. 2015) (per curiam) ("The Court in *Johnson* noted that 'laws [which] require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*,' like the SORNA residual clause, were distinguishable from the law it declared unconstitutionally vague." (alteration in original) (quoting *Johnson*, 135 S. Ct. at 2561)). And, in our view, that is the correct interpretation.

¶63 Comparing Utah's aggravated abuse of a vulnerable adult statute to the ACCA reveals that our statute does not call for the categorical approach. The ACCA asks a court to examine whether the defendant has been convicted of a "violent felony." *Johnson*, 135 S. Ct. at 2557. The ACCA's residual clause "refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." *Taylor*, 495 U.S. at 600 (omission in original) (quoting 18 U.S.C. § 924(e)(1)). Additionally, the ACCA "defines 'violent felony' as any crime . . . that 'has as an element'—not any crime that, in a particular case, involves—the use or threat of force." *Id.* (quoting 18 U.S.C. § 924(e)(2)(B)(i)).

¶64 In contrast, the aggravated abuse of a vulnerable adult statute requires a court to examine conduct rather than elements. Our statute mandates that a court analyze whether the defendant "causes a vulnerable adult to suffer serious physical injury" "[u]nder any circumstances likely to produce death or serious physical injury." UTAH CODE § 76-5-111(2). And the definition of "[s]erious physical injury" requires examination of the underlying facts of a crime to determine whether the defendant's conduct caused physical injuries such as "skin bruising, a dislocation, physical pain, illness, . . . bleeding, [or] malnutrition," or a combination of physical injuries, that "seriously impair[] a vulnerable adult's health." *Id.* § 76-5-111(1)(o), (q)(i).

¶65 Because the aggravated abuse of a vulnerable adult statute does not require a categorical approach, *Johnson* does not mark our analytical path. *See supra* ¶ 63. Accordingly, we follow the traditional route that starts with an examination of whether the aggravated abuse of a vulnerable adult statute is vague as applied to Tulley. Tulley contends that he can mount an as-applied challenge to the language "seriously impairs a vulnerable adult's health." UTAH CODE § 76-5-111(1)(q)(i).

¶66 We first examine whether the language of our aggravated abuse of a vulnerable adult statute is so vague that Tulley would have had inadequate notice that his assault of Victim had the potential to cause a "physical injury or set of physical injuries" that "seriously impairs a vulnerable adult's health." *Id.*; *see Holm*, 2006 UT 31, ¶ 77 ("To survive a void-for-vagueness challenge, a criminal statute must [first] 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement . . . .'" (quoting *Kolender*, 461 U.S. at 357)).

¶67 Tulley argues that he was not put on notice "as to whether hitting [Victim] in the face 4–5 times was a circumstance likely to produce such an unknown injury." The State argues that the definition of physical injury "puts ordinary persons on notice that repeatedly punching an elder[ly] adult in the face, with or without an object, is likely to produce bruising, bleeding, swelling, bone fractures, and physical pain." And the State argues that, when considered together with the definition of "physical injury," the definition of "serious physical injury" places an ordinary person on notice that infliction of the injuries like those Tulley visited upon Victim are likely to seriously impair an elderly adult's health.

¶68 Tulley testified that he punched Victim in the face four or five times. Victim sustained multiple facial lacerations "requiring plastic surgery repair," facial swelling, bruising to one of his eyeballs, and when he arrived at the hospital, he was in "serious" condition and his eyes were "swollen closed." Victim's nasal bone, nasal septum, and eye sockets were fractured. Victim also had blood in his sinuses, indicative of "fractures of the sinuses." Victim also sustained a traumatic brain injury and doctors concluded that there was "a reasonable risk that he would die" from his injuries. Victim remained in the hospital for nearly two days and was placed in a skilled nursing facility after discharge.

¶69 Tulley would have had to have known that wherever the precise boundary between physical injury and serious physical injury might lie, hitting a 71-year-old man in the face four to five times with the force to produce "skin bruising," "physical pain," "impairment of physical function," "bleeding," "a bone fracture," "soft tissue swelling, [or] injury to any internal organ" had the potential to "seriously impair[]" Victim's health. UTAH CODE § 76-5-111(1)(o), (1)(q)(i). Tulley cannot persuasively argue that he would not have known that using the force that caused the severity of the injuries he inflicted on Victim could result in serious bodily injury.

¶70 We next consider whether the aggravated abuse of a vulnerable adult statute "is sufficiently definite . . . as to discourage arbitrary and discriminatory enforcement." *Holm*, 2006 UT 31, ¶ 85 (omission in original) (citation omitted). To avoid unconstitutional vagueness, criminal statutes must "establish minimal guidelines to govern law enforcement" to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (alteration in original) (citation omitted). Statutes should also avoid "entrusting lawmaking 'to the moment-to-moment judgment of the policeman on his beat.'" *Smith v. Goguen*, 415 U.S. 566, 575 (1974) (citation omitted). "When confronted with an as-applied challenge to the constitutionality of a criminal statute, 'it is the application of the [challenged statute] to defendant[] by law enforcement officials we review.'" *Holm*, 2006 UT 31, ¶ 85 (alterations in original) (quoting *United States v. LaHue*, 261 F.3d 993, 1007 (10th Cir. 2001)).

¶71 When the police arrived at Victim's apartment, they walked into "[a] bloody mess." Blood was "smeared on the walls [and] smeared all over the floor" in the hallway. The police found two teeth on the bedroom floor. Between the bedroom and the bathroom, they found a golf club with a "brownish substance" on it. In the

bathroom, they found blood on the floor, blood spatters on the wall, wet, bloody towels, a bloody towel rack that had been pulled from the wall with its brackets still attached, a bloody, broken, wooden spoon, a torn-down shower curtain, and blood in the bathtub and on the sink.

¶72 Further, the police found Victim "lying in a pool of blood." He had blood "all over him" and "was lying prone on the floor not moving." The facial trauma Victim sustained caused one officer to believe that Victim had died.

¶73 The facts establish that Tulley assaulted Victim, and based on the nature of his injuries, prosecutors acted reasonably in concluding that the abuse rose to the level of serious bodily injury. *See Kolender*, 461 U.S. at 358 (holding that criminal statutes must establish minimal guidelines to govern police, prosecutors, and juries). Because of the state of the crime scene, in addition to Victim's apparent injuries, and the officer's concern that Victim may be dead, we conclude that "no reasonable law enforcement official acquainted with [Tulley's] behavior could conclude other than that" Tulley had committed aggravated abuse of a vulnerable adult. *Holm*, 2006 UT 31, ¶ 86. Accordingly, Tulley has failed to demonstrate that the aggravated abuse of a vulnerable adult statute is vague as applied to him.

## IV. The Habitual Offender Statute

¶74 Tulley contends that Utah's habitual offender statute violates the Utah Constitution's cruel and unusual punishment and double jeopardy clauses. Specifically, Tulley argues that the "Utah Constitution's cruel and unusual punishment and double jeopardy clauses protect third degree felony offenders from receiving a first degree felony sentence based on prior convictions," and that "Utah's habitual offender statute violates these provisions as applied to third degree felony offenders like Tulley." As an initial matter, we point out that although Tulley received a sentence enhancement to a first degree felony sentence, he also received a sentence reduction, resulting in an overall enhancement to a second degree felony sentence.

¶75 Under the statute, a defendant is a "[h]abitual violent offender" if he or she is "convicted . . . of any violent felony and . . . on at least two previous occasions has been convicted of a violent felony" as enumerated in Utah Code section 76-3-203.5(1)(c). UTAH CODE § 76-3-203.5(1)(b). If "the trier of fact determines beyond a reasonable doubt that the person is a habitual violent offender," the penalty for a "third degree felony is as if the conviction were for

a first degree felony . . . ." *Id.* § 76-3-203.5(2)(a). Tulley argues the cruel and unusual punishment and double jeopardy clauses protect against this sentence enhancement.

¶76 We have held that under article I, section 9 of our state constitution, a punishment is cruel and unusual "if it is 'so disproportionate to the offense committed that it shock[s] the moral sense of all reasonable [persons] as to what is right and proper under the circumstances.'" *State v. Lafferty*, 2001 UT 19, ¶ 73, 20 P.3d 342 (first alteration in original) (citation omitted). And, although a divided court dedicated a lot of ink to analyzing the viability and *stare decisis* value of that holding, it remains the standard unless and until a party shoulders the burden of setting it aside. *See generally State v. Houston*, 2015 UT 40, 353 P.3d 55.

¶77 Tulley argues that Utah's habitual violent offender statute "collapses both second and third degree felonies into the sentencing category occupied by first degree felony offenses." And that by effectively punishing a third degree felony with the same severity as a first degree felony, "the statute undermines the state constitutional guarantee that sentences be graduated and proportionate to the offense." Tulley also argues that the statute "leaves little room for courts to impose punishments that are proportionate to the offender." "In light of evolving views on criminal punishment," Tulley argues, "imposing a first degree felony sentence on a third degree felony offender would 'shock[] the moral sense of all reasonable [persons] as to what is right and proper under the circumstances.'" (Quoting *Lafferty*, 2001 UT 19, ¶ 73).

¶78 This conclusory line fails to persuade. Tulley's two prior convictions were for attempted sexual abuse of a minor and attempted robbery. The sentence enhancement Tulley ultimately received changed his sentence from zero-to-five years to one-to-fifteen years. In light of Tulley's history of violent felonies, we cannot conclude that this sentence would shock the moral conscience of all reasonable people.

¶79 Perhaps sensing that the *Lafferty* hurdle would be difficult to overcome, Tulley also engages in an interesting discussion of Utah history and asserts that both the double jeopardy and cruel and unusual punishment clauses should be interpreted in light of that history. With respect to the cruel and unusual punishment clause, Tulley posits that the experience of many Utahns sentenced for violation of polygamy laws informs the way we should understand the protections the framers enshrined in article 1, section 9.

¶80 We applaud Tulley's efforts to engage with the original meaning of our constitution. When asking this court to interpret constitutional language, a party should "analyze the plain meaning of the constitutional text, our prior case law, the interpretation other courts have given to similarly worded provisions in their state constitutions, and what lessons might be gleaned from the historical context." *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 100, 416 P.3d 635 (Pearce, J., concurring).

¶81 As much as we appreciate Tulley's efforts here, he ultimately does not provide the type of examination of the historical record necessary to demonstrate that these clauses protect against the sentence enhancements at issue here. For example, Tulley argues that "[t]he intent of the framers in drafting the [cruel and unusual punishment clause] reflects a concern for disproportionate sentences." To support his argument, Tulley explains that "attempts to wipe out polygamy resulted in 'numerous [ ] violations of basic rights provided by the Bill of Rights,' and accused polygamists faced 'extreme sentences' that were disproportionate to the sentences for other crimes." (Alteration in original) (Quoting Martha Sonntag Bradley, *"Hide and Seek": Children on the Underground*, 51 UTAH HIST. Q. 133, 134, 141 (1983)). Tulley suggests that because the framers of the Utah Constitution were "aware of the disproportionate sentences handed out to polygamists," they "would make every effort to ensure the state constitution protected against such sentences." But citation to one historic example, without more, is not enough to demonstrate that the framers of the Utah Constitution intended the constitutional guarantees to protect against sentences like the one dictated by the sentence enhancement our habitual violent offender statute imposes.

¶82 Tulley can be forgiven for framing his argument this way, as it models the way in which we have, at times, approached these issues. Indeed, some of our case law interpreting the state constitution has followed "a pattern of asserting one, likely true, fact about Utah history and letting the historical analysis flow from that single fact." *Waite*, 2017 UT 86, ¶ 101 (Pearce, J., concurring). This type of analysis poses problems because "undue reliance on arguments based primarily upon the zeitgeist risks converting the historical record into a type of Rorschach test where we only see what we are already inclined to see." *Id.*

¶83 For example, contrary to Tulley's historical argument, the framers of the constitution did not appear to make "every effort to ensure the state constitution protected against [disproportionate] sentences." Most significantly, the framers did not make the effort to

ensure that article 1, section 9 contained the word disproportionate or otherwise make any reference to disproportionate sentences.[12] UTAH CONST. art. I, § 9. We need to know what principles the framers enshrined in the words "nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor." *Id.* And while the historical backdrop may be one piece of the puzzle, it does not, by itself, reveal the entire picture.[13]

¶84  Tulley's examination of the double jeopardy clause is even less illustrative. Tulley argues that "[i]n Utah and beyond, policy makers and voters are realizing that a system of mass incarceration is unsustainable, unjust, and poor policy." Tulley cites a report of the Utah Commission on Criminal and Juvenile Justice and a Utah House bill which "amends Utah Code provisions regarding corrections, sentencing, probation and parole, controlled substance offenses, substance abuse and mental health treatment, vehicle offenses, and related provisions to modify penalties and sentencing guidelines, treatment programs for persons in the criminal justice system, and probation and parole compliance and violations to address recidivism." *See* 2015 Utah Laws 2254. Yet Tulley does nothing beyond citing this material to explain how these recent policy trends should affect our interpretation of the double jeopardy clause of the Utah Constitution. *See Bank of Am. v. Adamson*, 2017 UT

---

[12] We do not suggest that the constitution would have to use the word disproportionate to give that meaning to the cruel and unusual punishment clause. But a party will have to convince this court that those who approved the Utah Constitution enshrined a protection that would invalidate disproportionate sentences.

[13] With respect to article 1, section 9, it bears remembering that, even though we did not reach consensus in *Houston*, we have spent considerable energy examining the meaning of that section. *See generally Houston,* 2015 UT 40. Any party asking us to reexamine the meaning we have ascribed to the cruel and unusual punishment clause will not be writing on a blank slate, and to meet her burden of persuasion, will likely need to engage with and expand upon the discussion we began in *Houston*.

2, ¶ 11, 391 P.3d 196 (An issue is inadequately briefed if the argument "merely contains bald citations to authority [without] development of that authority . . . ." (alteration in original) (citation omitted)). Although Tulley has raised interesting policy arguments, those arguments do not speak to the meaning of our double jeopardy clause.

¶85 In short, Tulley has not demonstrated that the habitual offender statute violates either the cruel and unusual punishment or double jeopardy clauses of the Utah Constitution.

## CONCLUSION

¶86 The district court did not abuse its discretion in excluding evidence of Victim's prior sexual misconduct and the district court correctly instructed the jury. We conclude that the aggravated abuse of a vulnerable adult statute is not unconstitutionally vague, and that Tulley has not demonstrated that the habitual violent offender statute violates the Utah Constitution. We affirm the district court.

———————————

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶87 I concur in the majority opinion but write separately to register my continuing discomfort with the proportionality standard established in *State v. Houston*, 2015 UT 40, 353 P.3d 55.[14] In *Houston* I set forth my view that article I, section 9 of the Utah Constitution, as originally understood, "does not deputize the courts to second-guess punishments they deem excessive or lacking in proportionality, but only to proscribe *methods* of punishment historically rejected as barbaric or torturous." *Houston*, 2015 UT 40, ¶ 157 (Lee, A.C.J., concurring in part and concurring in the judgment). This remains my

———————————

[14] The majority attributes the standard it applies to *State v. Lafferty*, 2001 UT 19, 20 P.3d 342. *Supra* ¶ 76. And the *Lafferty* opinion does apply a standard like that employed by the court today. But I view *Houston* as the key turning point in our jurisprudence—because prior to *Houston* "no majority opinion of this court [had] ever employed a state standard of proportionality that is distinct from the federal standard." *State v. Houston*, 2015 UT 40, ¶ 142, 353 P.3d 55 (Lee, A.C.J., concurring in part and concurring in the judgment). Our prior cases, including *Lafferty* and also *State v. Herrera*, 1999 UT 64, ¶ 39, 993 P.2d 854, "simply parroted the governing federal standard" and adopted it as our Utah standard without any independent analysis of the terms of article I, section 9. *Houston*, 2015 UT 40, ¶ 142 (Lee, A.C.J., concurring in part and concurring in the judgment).

firmly held position. The briefing and argument in this case have only reinforced the concerns that I expressed in *Houston*. They demonstrate that judicial review for proportionality is both incompatible with the original meaning of the Utah Constitution and too "hazy and unworkable" to establish a reliable "guidepost" for judges and litigants. *See id.* ¶ 146.

¶88 My point is not to fault the majority for its basis for resolving this case. The *Houston* standard is, as the majority notes, the law of the State of Utah. So unless and until that standard is set aside, the court cannot be faulted for applying it. I write separately, however, to reiterate some of the concerns that I raised in *Houston*—and to observe that they are highlighted by our disposition of the case before us on appeal.

¶89 The majority concludes that Mr. Tulley's sentence—one-to-fifteen years (enhanced from zero-to-five years) for aggravated abuse of a vulnerable adult—would not "shock the moral conscience of all reasonable people." *Supra* ¶ 78. Yet the court offers little insight into the basis of that conclusion. And I see no way for us to make that sort of judgment in any reliable, transparent way. Without access to polling data (hardly a basis for judicial decision making) I am unsure how we can gauge the "moral conscience" of the people on the propriety of a given criminal sentence. The best evidence available to us on that question is the view expressed by the people's representatives in the legislature, who enacted the applicable sentence enhancement provision into law. *See* UTAH CODE § 76-3-203.5. It seems a little presumptuous for judges to purport to understand the people's conscience better than their elected representatives (who are regularly accountable to them in elections).

¶90 This standard thus asks us to second-guess the judgment made by the legislature by consulting our "humanitarian instincts" and personal beliefs. *See Houston*, 2015 UT 40, ¶ 155 (Lee, A.C.J., concurring in part and concurring in the judgment). Our instincts and beliefs are useful—and even essential—on any of a range of discretionary judgment calls we make in the judiciary. But they can't form the reliable basis for a principle of constitutional law.

¶91 For now I am content to concur in an opinion that applies our precedent to the resolution of the case before us. But I, for one, would remain open to an invitation that we revisit the standard we established in *Houston* in an appropriate case in the future.